**LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP**
Michael W. Sobol, State Bar. No. 194857
Melissa Gardner, State Bar No. 289096
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
msobol@lchb.com
mgardner@lchb.com

**LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP**
Douglas Cuthbertson (*pro hac vice*
forthcoming)
Jahi Liburd (*pro hac vice* forthcoming)
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212 355-9500
Facsimile: 212-355-9592
dcuthbertson@lchb.com
jliburd@lchb.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (*pro hac vice* forthcoming)
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 233-6334
jguglielmo@scott-scott.com

**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
Nicole Ramirez Jones, State Bar No. 279017
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812
koncius@kiesel.law
ramirezjones@kiesel.law

**SIMMONS HANLY CONROY, LLC**
Jason 'Jay' Barnes (*pro hac vice* forthcoming)
An Truong (*pro hac vice* forthcoming)
112 Madison Avenue, 7th Floor
New York, NY 10016
Telephone: (212) 784-6400
Facsimile: (212) 213-5949
jaybarnes@simmonsfirm.com
atruong@simmonsfirm.com

*Attorneys for Plaintiffs and the Proposed Class*
[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE I and JANE DOE I,<br><br>                              Plaintiffs,<br><br>        v.<br><br>CALIFORNIA PHYSICIANS' SERVICE D/B/A BLUE SHIELD OF CALIFORNIA,<br><br>                              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 3

PARTIES .......................................................................................................... 6

JURISDICTION AND VENUE ........................................................................... 6

FACTUAL ALLEGATIONS ............................................................................... 8

I.     Blue Shield Is Entrusted with Highly Personal Protected Information............................. 8

II.    Blue Shield Admits it Disclosed Protected Information to Google ................................... 9

III.   Forensics Corroborate Blue Shield's Admissions ............................................................ 11

       A.     Google Analytics Was Integrated Extensively and In Depth Across the
              Blue Shield Websites ..................................................................................... 12

       B.     Google Ads Products Were Integrated Extensively and In Depth Across the
              Blue Shield Websites ..................................................................................... 14

IV.    Blue Shield's Admissions Are Misleading as to the Scope of Its Misconduct.................. 15

       B.     The Breach Began Before 2021 ..................................................................... 15

       C.     Google's Advertising Misuse of Protected Data Began Before 2021.................... 16

       D.     Google Was Not the Only Entity to Whom Blue Shield Wrongfully
              Disclosed Protected Information Before and After 2021...................................... 16

       E.     Plaintiffs and Class Members Are at Risk of Repeated Similar Invasions .......... 18

V.     Blue Shield Breached its Duties and Promises to Plaintiffs and Other Members ............ 19

       A.     Blue Shield Violated its Privacy Policies and Promises ..................................... 20

       B.     Blue Shield Compounded the Damage it Caused by Failing to Timely
              Notify Members of the Data Breach ................................................................ 23

VI.    Plaintiffs Did Not Consent to Blue Shield's Conduct and Were Harmed ....................... 25

CLASS ACTION ALLEGATIONS ..................................................................... 27

CAUSES OF ACTION ....................................................................................... 32

       COUNT ONE California Constitutional Invasion of Privacy (On behalf of
       California Subclass) ................................................................................................ 32

       COUNT TWO California Invasion of Privacy Act ("CIPA") Cal. Penal Code
       § 631, *et seq.* (On behalf of Nationwide Class and California Subclass) ............ 34

       COUNT THREE Negligence (On behalf of Nationwide Class and California
       Subclass) ............................................................................................................... 36

       COUNT FOUR Breach of Express Contract – Evidence of Coverage (On behalf of
       Nationwide Class and California Subclass) ............................................................ 40

       COUNT FIVE Breach of Express Contract – Blue Shield Terms of Use (On behalf
       of Nationwide Class and California Subclass)........................................................ 41

       COUNT SIX Breach of Implied Contract (On behalf of Nationwide Class and
       California Subclass) ............................................................................................... 44

       COUNT SEVEN Electronic Communications Privacy Act ("ECPA") 18 U.S.C.
       § 2510, *et seq.* (On behalf of Nationwide Class and California Subclass) .......... 46

**TABLE OF CONTENTS**
**(continued)**

Page

COUNT EIGHT Confidentiality of Medical Information Act ("CMIA") Cal. Civ. Code § 56 *et seq.* (On behalf of California Subclass) ............................................. 51

COUNT NINE California Consumer Privacy Act ("CCPA") Cal. Civ. Code § 1798.100 *et seq.* (On behalf of California Subclass) ........................................ 53

COUNT TEN California Customer Records Act ("CRA") Cal. Civ. Code § 1798.80 *et seq.*  (On Behalf of California Subclass) .......................................... 55

COUNT ELEVEN California Unfair Competition Law ("UCL") Cal. Bus. & Prof. Code § 17200, *et seq.*  (On behalf of California Subclass) ................................... 58

COUNT TWELVE Declaratory Judgment Pursuant to 28 U.S.C. § 2201, *et seq.* (On behalf of Nationwide Class and California Subclass).................................... 61

PRAYER FOR RELIEF ................................................................................................... 63

DEMAND FOR JURY TRIAL ......................................................................................... 63

Plaintiffs John Doe I and Jane Doe I ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Defendant California Physicians' Service d/b/a Blue Shield of California ("Defendant" or "Blue Shield") upon personal knowledge as to their own acts, and based upon investigation of counsel and information and belief as to all other matters.

## INTRODUCTION

1.    Plaintiffs bring this class action on behalf of current and former Blue Shield members whose communications, medical information, financial information, and other personal information (collectively, "Health Information"), Defendant Blue Shield shared with unauthorized third parties through invisible third-party online surveillance technologies (the "Tracking Technologies") on Blue Shield websites.

2.    Blue Shield recently admitted to disclosing its members' Health Information, i.e., private communications and other protected information, to Google between 2021 and 2024, and further acknowledged that the disclosures were made inconsistent with permissible use of this protected data. These admissions are memorialized in a Notice of Data Breach that Blue Shield issued to approximately 4.7 million Blue Shield members on or around April 9, 2025 (the "Google Data Breach Notice").[1]

3.    While the Google Data Breach Notice reflects extensive unlawful violations of Plaintiffs' and Class members' privacy rights, it omits large swaths of Blue Shield's misconduct. Based on the investigation of counsel, Blue Shield also configured its websites to disclose protected communications and data to third parties other than Google, including some of the largest data companies in the world. For example, archived versions of the Blue Shield websites from the past several years showed transmittals from sensitive pages to, e.g., Meta (Facebook), LinkedIn, TikTok, NextRoll, Inc., Verint Systems, Inc., Marketo (now part of Adobe), Adelphic (now owned by Viant Technology LLC ("Viant")), Dynatrace, and Adobe, who also deploy their third-party website surveillance products for the monetization of user data and user profiling. Further, Blue Shield's disclosures via Tracking Technologies on its websites commenced no later than 2017, not

---

[1] Blue Shield, Notice of Data Breach dated Feb. 9, 2025, available at https://news.blueshieldca.com/notice-of-data-breach (last accessed May 5, 2025).

in 2021 as it suggests. While Blue Shield appears to have largely sanitized and limited the third party tracking it permitted as of approximately 2024, its failure to acknowledge the full scope of its misconduct to date strongly suggests that it will commit similar violations again in the future.

4.      Blue Shield had, and continues to have, a duty arising from the common law, applicable statutory law and regulatory guidelines, its own contractual commitments and promises, and societal expectation, to protect members' Health Information. Blue Shield's duty includes the duty to protect and secure Plaintiffs' information, as well as a duty to timely notify its members of any unauthorized disclosures, including unauthorized disclosures through Tracking Technologies.

5.      By deliberately installing and failing to monitor the Tracking Technologies, Blue Shield negligently, recklessly, and/or intentionally agreed to and procured third parties' access to protected information exchanged on Blue Shield websites. Blue Shield did not implement adequate data security measures to ensure that its websites were secure and that sensitive data was not being collected from Blue Shield members accessing the websites. Blue Shield's acts, in turn, allowed these third parties to identify and profile individuals based on illicitly collected Health Information. The collection and transmission of information was done in real-time. Plaintiffs and putative Class members did not provide consent.

6.      Blue Shield knew that properly understanding and restricting Tracking Technologies was of paramount concern and yet willfully disregarded the sensitivity and highly protected nature of the Health Information at issue. Using and misconfiguring the technology that allowed Health Information to be shared with third parties – particularly those that are well known to be engaged in data mining and user profiling – is a failure of due diligence to the extreme.

7.      This was not a one-time or short-duration event. Blue Shield's misconduct resulted in sending member Health Information to third parties for years, and – in the case of Google –for at least three years without members' knowledge or consent, by Blue Shield's admission.

8.      Moreover, Blue Shield's failure to timely notify members (or notify them at all) that it had facilitated sharing their Health Information with unauthorized third parties plainly violated its obligations under applicable laws, and Blue Shield's contractual commitments.

CLASS ACTION COMPLAINT

9.      Plaintiffs and Class members have been harmed because their Health Information has been shared with unauthorized third parties. They suffer harm in the loss of privacy, the loss of control over private conversations, Blue Shield's failure to provide the benefit of their bargain, and the loss of value of their data which cannot be easily recovered, if ever. Plaintiffs do not know what these entities have done with their Health Information; if it has been sold, transferred, replicated, or irrevocably disseminated or exposed.

10.      Blue Shield has not identified how, if at all, it is attempting to claw back the data it disclosed to third parties.

11.      Blue Shield has also not disclosed whether it has notified those third parties to delete the Health Information unlawfully collected through the Tracking Technologies.

12.      Plaintiffs, individually and on behalf of a nationwide class and a California Subclass, allege claims for (1) Violation of the California Constitution, Article 1 § 1; (2) Violation of the California Invasion of Privacy Act ("CIPA") (Cal. Penal Code § 631); (3) Negligence; (4) Breach of Express Contract – Evidence of Coverage; (5) Breach of Express Contract – Blue Shield Terms of Use; (6) Breach of Implied Contract; (7) Violation of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2510, *et seq.*); (8) Violation of the Confidentiality of Medical Information Act ("CMIA") (Cal. Civ. Code § 56 *et seq.*); (9) Violation of the California Consumer Privacy Act ("CCPA") (Cal. Civ. Code § 1798.100 *et seq.*); (10) Violation of California's Customer Records Act ("CRA") (Cal. Civ. Code § 1798.80, *et seq.*); (11) Violation of California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200, *et seq.*); and (12) relief under the Declaratory Judgment Act (28 U.S.C. § 2201, *et seq.*).

13.      Plaintiffs further ask the Court to compel Blue Shield to adopt and maintain reasonable information security practices to secure Health Information that Blue Shield collects and stores in its databases, to prevent and stop Blue Shield from facilitating the disclosure of Health Information via the Tracking Technologies (or any additional third parties), and to grant such other relief as this Court deems just and proper.

CLASS ACTION COMPLAINT

**PARTIES**

14.     Plaintiff Jane Doe I is a resident of Los Angeles County, California, was a paying member of Blue Shield during the relevant time period and received the Google Data Breach Notice. She is a current Blue Shield member.

15.     Plaintiff John Doe I is a resident of Alameda County, California, was a paying member of Blue Shield during the relevant time period and received the Google Data Breach Notice. He is a former Blue Shield member having stopped being a member in late 2021.

16.     Defendant California Physicians' Service d/b/a Blue Shield of California is an independent member of the Blue Shield Association that provides health insurance to consumers in California.[2]  Ascendiun is Blue Shield of California's ultimate parent and the primary Blue Cross Blue Shield Association licensee. Blue Shield represents that it currently has nearly six million members, over 7,500 employees and more than 25 billion dollars in revenue.[3]  As of January 2024, Blue Shield represented that it had nearly 4.8 million members.[4]  Blue Shield's Corporate offices are located at 601 12th Street, Oakland, California 94607.[5]

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction over the federal claims in this action.

18.     This Court has subject matter jurisdiction and diversity jurisdiction over all claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The class contains more than 100 members, and many of these members have citizenship diverse from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U. S.C. § 1367(a) because all claims alleged herein form part of the case in controversy.

19.     The exercise of personal jurisdiction over Defendant is appropriate. Blue Shield of California is a California corporation and its principal place of business is in this District.

---

[2] https://www.blueshieldca.com/en/home/about-blue-shield (last accessed May 5, 2025).
[3] https://news.blueshieldca.com/about (last accessed May 5, 2025).
[4] https://web.archive.org/web/20240105213347/https://news.blueshieldca.com/about (last accessed May 5, 2025).
[5] https://www.blueshieldca.com/en/home/about-blue-shield/corporate-information/locations (last accessed May 5, 2025).

CLASS ACTION COMPLAINT

20.     Venue is proper in this District under 28 U.S.C. § 1391(a)(2), § 1391(b)(2), and § 1391(c)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District. Specifically, Blue Shield's principal place of business is in this District, it is headquartered in this District, it is a California corporation, and its methodology for assessing website security and privacy protections, vendor security systems, representations, decision-making, and security practices emanated from this District.

21.     This Court has equitable jurisdiction to entertain claims and award remedies that are equitable in nature because Plaintiffs lack an adequate remedy at law. Monetary damages cannot make Plaintiffs whole for the totality of the harm to privacy rights, rights to dignity, rights to self-determination and rights to control access and use of their Health Information, or for the harm to societal and personal expectations of privacy and justice violated by Blue Shield's conduct alleged herein. Monetary damages cannot make Plaintiffs whole for the harms caused by alleged violations of statutes which do not provide for private rights of action, or for alleged violations of laws which limit their application to particular aspects of the broad-ranging pattern of activity alleged herein. Further, there is no adequate remedy at law and an award of damages under the law will not necessarily encompass profits or benefits that unjustly inure to Defendant. Additionally, Plaintiffs may be unable to obtain full relief on a class-wide basis under each legal claim and/or on behalf of a certified Class due to different requirements of proof (e.g., mens rea and reliance) and the Court may permit Plaintiffs to plead both damages and, in the alternative, equitable remedies at the early pleadings stage. In addition, the Court has equitable jurisdiction to issue injunctions that serve different purposes and remedy different harms than retrospective monetary damages.

22.     Divisional Assignment: This action arises in Alameda County, in that a substantial part of the events which give rise to the claims asserted herein occurred in Alameda County, where Defendant is headquartered and located. Pursuant to L.R. 3-2(d), all civil actions that arise in Alameda County and San Francisco County shall be assigned to the San Francisco or Oakland Division.

CLASS ACTION COMPLAINT

**FACTUAL ALLEGATIONS**

**I.     Blue Shield Is Entrusted with Highly Personal Protected Information**

23.    In order to access and use Blue Shield services, Plaintiffs were required to provide, and did provide, all or part of the following non-exclusive information to Blue Shield:

a.    Full name and contact information, including mailing address, email address, and telephone number.

b.    Social Security Number.

c.    Date of birth.

d.    Employer information.

e.    Family and dependent information, including dependent familial relationship, Social Security Number, date of birth, gender, and student status.

f.    Medical information including but not limited to information about diagnosis and treatment, personal medical history, family medical history, mental health information, information related to STDs and treatment, medication information, and medical record number.

g.    Information about physicians and related medical professionals who had been involved in previous or ongoing treatment of the patient.

h.    Billing and claims information including, but not limited to, information related to credit and debit card numbers, bank account statements and account numbers.

i.    Medicare/Medicaid information.

j.    Information on prescriptions taken including prescription history.

24.    Plaintiffs Jane Doe I and John Doe I were also required to use the Blue Shield websites in order to access their Blue Shield services.

25.    Plaintiff Jane Doe I routinely communicated with Blue Shield on its websites, including concerning her Health Information, when searching for medical providers (including by using the Blue Shield "Find a Doctor" search mechanism that allows for searching doctors and services by doctor name, specialty, and condition), making appointments with medical providers, reviewing explanation of benefit (EOB) forms for submitted claims, reviewing medical information

and making payments, among other activities. When Jane Doe I accessed the Blue Shield websites, she typically did so from California.

26.    Plaintiff John Doe I routinely communicated with Defendant on its websites, including concerning his Health Information, when searching for in-network providers for particular medical concerns providers (including by using the Blue Shield "Find a Doctor" search mechanism that allows for searching doctors and services by doctor name, specialty, and condition), attempting to understand available care associated with the COVID-19 pandemic, and reviewing explanation of benefit (EOB) forms for submitted claims. When John Doe I accessed the Blue Shield websites, he typically did so from California.

## II.    Blue Shield Admits it Disclosed Protected Information to Google

27.    In April 2025, Blue Shield issued the Google Data Breach Notice to approximately 4.7 million Blue Shield members, and, on April 9, 2025, posted the notification on its website.[6]

28.    Blue Shield issued the Google Data Breach Notice to current and former Blue Shield members. Both Plaintiffs Jane Doe I and John Doe I received an email from Blue Shield (image below) directly.



April 07, 2025

**Notice of Data Breach**

Dear ██████,

We are writing to inform you about a potential data breach. It is reasonably believed that certain elements of your protected health information may have been accessed, acquired, used, or disclosed to a third party. Due to the complexity and scope, we are unable to confirm whether your specific information was affected but are sending this notice out of an abundance of caution. Blue Shield assures you that we take this matter very seriously. We have taken measures to safeguard against similar future disclosures.

---

[6] https://news.blueshieldca.com/notice-of-data-breach (last accessed May 5, 2025).

CLASS ACTION COMPLAINT

29.     As part of the Google Data Breach Notice, Blue Shield stated:

"Blue Shield of California has begun notifying certain members of a potential data breach that may have included elements of their protected health information. Due to the complexity and scope of the disclosures, Blue Shield is unable to confirm whether any particular member's specific information was affected. Out of an abundance of caution, Blue Shield is providing notice to all members who may have accessed their member information on the potentially impacted Blue Shield websites during the relevant time frame. Blue Shield takes this matter very seriously and has already initiated measures to safeguard against similar future disclosures."[7]

30.     Blue Shield indicated that it shared the following Health Information with Google: "Insurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for members' online accounts; medical claim service date and service provider, patient name, and patient financial responsibility; and "Find a Doctor" search criteria and results (location, plan name and type, provider name and type)."[8]

31.     The Google Data Breach Notice further stated that as early as April 2021, Blue Shield configured Google Analytics on its websites in a manner that enabled the transmission of private member data, which likely included Health Information, to be shared with Google.

32.     Blue Shield asserted that it "severed" the connection between Google Analytics and Google Ads in January 2024. In contradiction, it further asserted that Blue Shield did not discover the connection until February 11, 2025.[9]

33.     The Google Data Breach Notice did not explain how Blue Shield could have been unaware of disclosures to Google for more than one year after purportedly taking action to terminate the disclosures. Nor did the Google Data Breach Notice explain why it took Blue Shield nearly two months after the date that it claims to have discovered its conduct to notify members that their Health Information had been collected and shared with Google without their consent.

34.     There is no indication in the Google Data Breach Notice that Blue Shield made an effort to retrieve and delete the Health Information collected and shared with Google, or if that is

---

[7] Id.
[8] https://news.blueshieldca.com/notice-of-data-breach (last accessed May 5, 2025).
[9] Id.

even possible, given that Google has already processed the information for use throughout its extensive products and offerings and may have shared this information with its partners, affiliates, and other data purchasers.

**III.    Forensics Corroborate Blue Shield's Admissions**

35.    Plaintiffs' allegations herein are based upon independent review of archived versions of the Blue Shield websites and associated code.

36.    The Internet Archive "Wayback Machine" stores versions of websites as they appeared at particular points in time. As of this filing, the Internet Archive Wayback Machine reports that it saved the Blue Shield homepage "https://www.blueshieldca.com/home" 2,564 times between December 19, 1996, and May 2, 2025. It has saved subdomains thousands of additional times. For example, there are more than 100 archived copies of the Blue Shield Find a Doctor search page beginning in 2018, and at least dozens of archived copies of pages for obtaining insurance quotes beginning in 2017, among many other records.

37.    In addition to preserving how a website looked and behaved on specific past dates, the Internet Archive Wayback Machine also preserves scripts that were present on the websites behind the scenes, as of the date of the archive. It attempts to load the scripts when a user interacts with the archived copy of a webpage as the website would have loaded them on the date of the website capture. These scripts include historically archived versions of Blue Shield's Google Tag Manager (GTM) "container" script.

38.    GTM is a tag management system that allows website owners to deploy and manage third-party scripts (known as "tags") without needing to edit the site's code each time a new tool is added or changed.[10]

39.    Through GTM, the website developer installs a snippet of code called a "container" on the websites.[11] This container acts as a centralized place for tracking codes installed on the

---

[10] https://support.google.com/tagmanager/answer/6102821#:~:text=Google%20Tag%20Manager%20is%20a,the%20Google%20Tag%20Manager%20website (last Accessed May 5, 2025).
[11] *Id.*

website, including third-party marketing and analytics tags.[12] For their part, website developers can configure the code to track particular pages, particular categories of "events" on the website, and can name the events. The Tracking Technology provider maintains the code and transmits the latest version when it is called for, and thus can update how it operates at any time.

40.    The container script associated with the Blue Shield websites bears the identifier WXBWNW, and is configured to load automatically for all visitors to the archived Blue Shield websites.[13] As of this filing, there are 112 archived copies of the GTM container script for Blue Shield websites, dated October 1, 2017, to September 11, 2024.

41.    To provide a concrete example of how the GTM container script reflects data collection generally, Blue Shield's GTM container shows "IFP Subsidy Calculator\",eventAction:\"Income\",eventLabel:jQuery(\"#incomeField\")," suggesting that when a member interacted with the income input field in the "IFP Subsidy Calculator" to determine whether they qualified for a federal subsidy for their individual or family plan, Blue Shield was packaging information about the interaction to send to an analytics or advertising endpoint.

42.    The archived GTM container file thus provides a blueprint of the Tracking Technologies Blue Shield chose to deploy from 2017 - 2024, the events and data it configured for collection, and the vendors to whom that data was sent. The fact of transmissions suggested by the GTM container can be confirmed, in part, by verifying requests made or attempted in network traffic on the archived versions of Blue Shield's websites.

A.    **Google Analytics Was Integrated Extensively and In Depth Across the Blue Shield Websites**

43.    Analysis of the GTM container script and network traffic on archived versions of the Blue Shield websites confirms that Blue Shield used Google Analytics. The GTM container script shows the presence of "gaProperty identifiers" for Google Analytics that are unique to the Blue Shield websites (UA-79648804-1; UA-79648804-4[14]). During interactions with archived

---

[12] *Id*.

[13] The documentation archived by the Internet Archive Wayback Machine is at
https://www.googletagmanager.com/gtm.js?id=GTM-WXBWNW.

[14] Between 2020 and 2023, Google Analytics 4 ("GA4") fully supplanted Universal Analytics as

CLASS ACTION COMPLAINT

1  versions of the websites, counsel witnessed the operation of code that transmits data concerning
2  communications and interactions with the website to Google.

3      44.     The GTM container was specifically and affirmatively configured to capture the
4  categories of sensitive information described in the Google Data Breach Notice. For example,
5  Google captured user-initiated selections from the "Find a Doctor" interface and related tools.
6  These interactions included choices such as doctor specialty, plan name and type, preferred
7  language, provider gender, medical group, and geographic filters like ZIP code or distance. This
8  behavioral data was captured in real time and explicitly mapped to custom dimensions in Google
9  Analytics—such as page.findaDoctor.planType—enabling Blue Shield and its analytics partners to
10  track and segment users based on their navigation through care provider options.

11      45.     Similarly, the code was configured to track interactions with a "Symptom Checker"
12  interface on the Blue Shield websites, which Blue Shield describes as a diagnostic tool "to help you
13  better understand your health."[15] When a user clicked on certain icons (e.g., "Woman," "Man," or
14  "Child") and then selected certain body parts or selected symptom descriptions, these interactions
15  were captured as structured events, including variables like "symptomcategory" and "eventLabel"
16  and transmitted to Google via Google Analytics. For example, if a user clicked on the "Woman"
17  icon and then selected "Abdominal pain," the resulting analytics event might have included
18  parameters such as eventCategory=SymptomChecker, eventAction=Click, eventLabel=Abdominal
19  pain, and symptomcategory=Woman.

20      46.     In addition to interface interactions, the site enabled Google Analytics to collect
21  structured data about individual users through user_properties and event_parameters. These fields
22  reflected a broad range of member-specific attributes, including identifiers such as member_id,
23  coverage details like plan_type and line_of_business, and demographic information such as
24  member_age, member_gender, and member_family_size, which members provided, for example,
25  when pricing premiums for particular policies and checking whether they qualified for financial

26

27  the primary analytics framework, and archived script from 2022-2024 confirms Blue Shield's
   continued use of GA4 (G-58MRGTZNPK, and later, also G-RK2XJ8KN77).
28  [15] A version of the symptom checker is still available on the web today, at
   https://www.blueshieldca.com/en/home/be-well/conditions-and-care-programs/symptom-checker.

CLASS ACTION COMPLAINT

assistance. The configuration also included socioeconomic indicators like ifp_income, ifp_household_size, and exchange_type, highlighting the extent to which Blue Shield's site transmitted sensitive personal data about both browsing behavior and account-linked user profiles.

47. The container further extracted data reflecting individual member attributes. These included the member's ID, authentication status (i.e., whether the user was logged in), ZIP code and city, gender, language, family size, relationship to the policyholder, employer name, and original plan join date.

48. Additionally, pursuant to the default non-optional configuration set by Google, the tracking configuration broadly recorded other information and communications reflecting Plaintiffs' and Class members' personal interests, healthcare and health insurance, finances, queries, and habits, including the URL visited, the referring URL, and user interaction events such as clicks on elements labeled "Check Authorization Status."

49. All of this data was associated with non-optional, non-preventable persistent user identifiers, including Google Analytics client IDs stored in browser cookies (such as _ga) and Blue Shield-specific identifiers (such as DynId). IP addresses may also have been transmitted to Google Analytics as part of the standard analytics payload, unless IP anonymization was explicitly enabled throughout the entire relevant period—which is not evident from archived versions of the GTM container script alone.

**B.    Google Ads Products Were Integrated Extensively and In Depth Across the Blue Shield Websites**

50. The GTM container script and network traffic on archived versions of Blue Shield's websites also confirm that Blue Shield of California maintained extensive integrations with Google Ads products. These included multiple configurations of Google's Floodlight conversion tracking—a technology used to monitor user actions like form submissions, plan views, or calls, and attribute them to digital ad campaigns. The Floodlight tags were linked to several advertiser accounts (e.g., IDs 10726943 and 9452090) and labeled to track distinct user interactions, such as "enroll," "showplan," and "callme." These tags allowed Google to monitor performance, optimize targeting, and remarket to users based on their site behavior.

51. Google Ads remarketing tags were also active, enabling Blue Shield to re-engage past visitors with targeted ads. These tags sent data to Google's servers about the pages users viewed and the actions they took.

52. The GTM container script also shows use of conversion linker functionality, which helps connect user interactions across different domains and sessions, improving attribution accuracy.

53. Finally, network traffic confirms that live tracking requests to Google's ad servers (e.g., googleads.g.doubleclick.net) were being fired from the site as archived, indicating that the configured tags were active and functioning. Requests included unique identifiers, screen dimensions, page metadata, and UTM parameters, indicating use for impression-based ad attribution and remarketing.

## IV. Blue Shield's Admissions Are Misleading as to the Scope of Its Misconduct

54. Blue Shield's Google Data Breach Notice indicates that the breach at issue began on April 1, 2021[16], terminated in January 2024, and only involved transmissions to Google. But this is not the full story. Blue Shield's own tracking configurations and historical web infrastructure show that its data transmissions began years earlier and extended to additional third parties beyond Google.

55. In fact, Blue Shield has facilitated the disclosure of protected information to numerous third parties that use the wrongfully obtained information for advertising and other purposes since no later than 2017.

### B. The Breach Began Before 2021

56. Blue Shield's suggestion that its breach commenced in 2021 is inaccurate. The earliest archived GTM container script that Plaintiffs' counsel has located, to date, is dated in October 2017, showing that Blue Shield used Google Analytics beginning in October 2017.

---

[16] Blue Shield listed the date of the breach on the State of California Department of Justice website as April 1, 2021.

CLASS ACTION COMPLAINT

**C.**     **Google's Advertising Misuse of Protected Data Began Before 2021**

57.     Blue Shield's suggestion that disclosures to Google Ads products began in 2021 is inaccurate. The GTM container deployed on the Blue Shield of California websites no later than 2017 included a configuration for Google's DoubleClick Ads platform, specifically employing Floodlight tags for conversion tracking and audience remarketing. The container script defines a function that sends requests to DoubleClick domains using standard Floodlight parameters, such as src (advertiser ID), type, cat, and u (user or behavioral identifier). While these tags may not have been integrated directly with Google Analytics in 2017 as they were in later years, they were independently capable of transmitting identifiers and user interaction data—potentially drawn from page content, form fields, or behavioral events—to Google's advertising servers. The GTM container as of 2017 also references Google Attribution tools, which support cross-device and cross-session ad attribution.

**D.**     **Google Was Not the Only Entity to Whom Blue Shield Wrongfully Disclosed Protected Information Before and After 2021**

58.     Blue Shield's suggestion that it facilitated disclosures only to Google is inaccurate. Analysis of the GTM container and archived network traffic reveals Blue Shield's broader tracking infrastructure, including tracking integrations associated with DoubleClick, Verint Systems, Inc. ("Verint") (upon information and belief, using technologies acquired from OpinionLab), Marketo (now part of Adobe), and Meta, including the Meta Pixel, as early as 2017, and later with LinkedIn, NextRoll, Adelphic (now owned by Viant), TikTok and others capturing user interactions, form inputs, and member-specific attributes.

59.     Three of the third parties that Blue Shield shared data with as early as 2017 are Verint, Marketo (later Adobe), and Meta.

60.     OpinionLab (upon information and belief, now rebranded as Verint Digital Experience) is a user feedback tool that collects real-time visitor comments and survey responses, often integrated with Google Analytics to correlate qualitative feedback with behavioral data such as bounce rates or page views. Marketo, a marketing automation platform that Adobe acquired in

2018 to bolster its marketing efforts, enables tracking of user behavior and form submissions for lead generation, audience profiling, and campaign targeting.

61.    As of 2017, Blue Shield's GTM container was configured to aid in sharing user-provided input on surveys and forms, collected via embedded technologies originally created by OpinionLab (now Verint) and Marketo modules—for example, free-text fields such as "Reason for Visit" and "Comment Topic." Blue Shield maintained integrations with OpinionLab (now Verint) and Marketo (now Adobe) for years, logging user-submitted input from feedback forms and opt-in surveys—such as "reasonForVisit," email, and username fields.

62.    In addition, the Blue Shield websites loaded a Meta (Facebook) Pixel (ID 886054698900363), no later than 2017. This Pixel appears to have been embedded in the websites directly in 2017, rather than via the GTM container, and transmitted information about each page an individual viewed, with identifiers, to Meta.

63.    This tracking infrastructure remained in place for years before Blue Shield's first public admission, expanding in breadth and granularity. There were several notable expansions by 2019. First, tracking was added for searches involving member ID, check numbers, EOB numbers (identifiers assigned by Defendant to a specific claim or payment), and total check amounts during provider claim interactions — all values with financial or identifying significance. Second, social and behavioral marketing tools were associated with the GTM container, including the Meta (Facebook) Pixel (ID 1864435530490581) that previously loaded separately from Google's GTM services, and LinkedIn Insight Tag ("_linkedin_data_partner_id = /118552/"). Third, the site began logging authentication-related interactions, such as whether a user responded "Yes, I am a member" during access prompts. Blue Shield also used specific tracking to distinguish between new and returning users. Overall, the 2019 setup reflects broader marketing attribution, expanded user profiling, and deeper instrumentation of user-submitted and contextual form data.

64.    By 2022, as confirmed through the GTM container script and network traffic captured from archived versions of the site, Meta Pixel tracking was implemented via the GTM container using multiple pixel IDs—1864435530490581, 1651795028309543, 335704600385427, 886054698900363 and 2347091692068426—which enabled Meta to collect page view data,

behavioral events, and contextual metadata (such as OpenGraph and Twitter tags). These pixels appeared to support distinct campaigns or retargeting audiences.

65.    Also in or around 2022-2023 at a minimum, the GTM container also included evidence that Blue Shield used a TikTok Pixel, embedded via the script "https://analytics.tiktok.com/i18n/pixel/events.js," a LinkedIn Insight Tag, enabled through the https://snap.licdn.com/li.lma-analytics/insight.min.js and linked to advertiser IDs through "_linkedin_data_partner_id". Plaintiffs' counsel's investigation revealed similar evidence that StackAdapt, a programmatic advertising and retargeting platform, received conversion signals via image-based pixels (/conv, /saq_pxl, and related endpoints), including persistent user identifiers such as sa-user-id and sa-user-id-v2. These identifiers, visible in network requests, support long-term cross-site user tracking and ad performance measurement.

66.    The GTM container deployed in 2023 also reflects integration with programmatic advertising platforms RollWorks and Adelphic. RollWorks is a digital marketing platform specializing in retargeting and personalized ad delivery across websites and social media, often using persistent identifiers and pixel-based tracking. The presence of RollWorks was confirmed through image pixel tags referencing domains such as adsrvr.org, commonly used for cross-site tracking and attribution reporting. Similarly, the container included tags pointing to w55c.net, a domain associated with Adelphic—a demand-side platform (DSP) that enables advertisers to buy digital media programmatically across mobile, desktop, and connected TV environments.

67.    The above is not a comprehensive list of all Tracking Technologies that Blue Shield deployed on its websites. In addition to the GTM container described herein, Blue Shield utilized other tag management system(s) including, but not limited to: Tealium iQ identified through the "pc-wunderman-collect.tealiumiq.com"; and Tag Commander, identified through the JavaScript function "internal.registerGtagCommandListener." The full scope of Blue Shield's unlawful conduct will be confirmed through discovery.

**E.    Plaintiffs and Class Members Are at Risk of Repeated Similar Invasions**

68.    Defendant apparently removed nearly all Tracking Technologies from its website in or around 2024 or 2025. Analysis of network traffic on Blue Shield's live websites conducted in or

around April and May 2025 revealed significantly fewer third-party vendors receiving information. Two entities with which Blue Shield continues to share Health Information today are Dynatrace and Adobe. Unlike Google Analytics and the other Tracking Technologies discussed above, however, these vendors offer tools that can be configured pursuant to HIPAA Business Associate Agreements and other safeguards, even to perform website analytics, without running afoul of the laws and public policies at issue in this action. How the Dynatrace and Adobe technologies are currently configured should be a subject of discovery. Whatever the configuration, Blue Shield or its third-party vendors could change it at any time. Blue Shield could begin using additional Tracking Technologies again at any time. At present, there is nothing to protect Blue Shield members from again inflicting the same harms on current or future Blue Shield members.

## V.    <u>Blue Shield Breached its Duties and Promises to Plaintiffs and Other Members</u>

69.    When Blue Shield accepted Plaintiffs and Class members as members, it assumed a duty to protect their information and maintain its security and confidentiality.

70.    Blue Shield's actions resulted in the unauthorized disclosure of Plaintiffs' and other members' Health Information to unauthorized data brokers and other entities with a persistent interest in compiling data about consumers.

71.    This breach is particularly egregious because Blue Shield, and third parties that operate Tracking Technologies, deployed them on the Blue Shield websites in such a way that Health Information was disclosed unlawfully for at least six years. Blue Shield failed to employ reasonable care in maintaining the privacy and security of Plaintiffs' and Class members' Health Information. Had Blue Shield implemented adequate security and monitoring measures, the true default operation of the Tracking Technologies would have been identified, along with any updates by third parties that expanded the information disclosed; any misconfiguration by Blue Shield itself would not have occurred or would have been corrected quickly; and there would not have been any disclosure allowed to persist on a daily basis affecting up to 4.7 million Blue Shield members for six years.

72.    Blue Shield's actions and failures to act appropriately were not disclosed to members and violated its duties and promises to members.

**A.**     **Blue Shield Violated its Privacy Policies and Promises**

73.     At all relevant times, Blue Shield represented that it would safeguard and protect members' Health Information. Blue Shield further represented that it would not share Health Information with unauthorized third parties.

74.     Specifically, Blue Shield's privacy and security polices set forth on its websites stated that it did not share Health Information with unauthorized third parties:

> We do not sell your personal information. Any personal information you provide on our website or App will be used only in ways consistent with this, the HIPAA and the GLBA Privacy Notices, and in accordance with applicable laws and regulations. We share information to support our business operations and to provide services to you. In doing so, we share the information we collect about you with appropriate employees and with service providers who assist us with, for example, administering our products and services, billing and payments, recruiting employment applicants, conducting surveys, and/or maintaining and operating our website and App. Please know that third party service providers are authorized to use your personal information only as necessary to provide services to us.[17]

75.     Blue Shield further stated that it limits the sharing of information to specific instances, none of which refer to sharing of information with third parties. Specifically, Blue Shield states that it "may also disclose your personal information in the following instances: As required by law, such as to comply with a subpoena, or similar legal process

- When we believe in good faith that it is necessary to protect our rights, your safety or the safety of others, investigate fraud, or respond to a government request

- In certain situations, Blue Shield may be required to disclose personal data in response to lawful requests by public authorities, including to meet national security or law enforcement requirements

- If Blue Shield is involved in a merger, acquisition, or sale of all or a portion of its assets, you will be notified via email and/or a prominent notice on our website of any change in ownership or uses of your personal information, as well as any choices you may have regarding your personal information

- Blue Shield may share your information with any other third party if you grant us consent to do so."[18]

---

[17] https://www.blueshieldca.com/en/home/about-blue-shield/privacy-and-security/online-mobile-privacy-notice (last accessed May 5, 2025).

[18] *Id.*

CLASS ACTION COMPLAINT

76.     Blue Shield did not disclose to its members that the Tracking Technologies it employed on its websites improperly collected members' Health Information that is then sent to unauthorized third parties. Specifically, Blue Shield represented on its privacy policy as to Tracking Technologies:

> these technologies are used in analyzing trends, administering the site, tracking users' movements around the site and to gather demographic information about our user base as a whole…. .We use cookies to remember users' settings (e.g., language preference) and for authentication. Users can control the use of cookies at the individual browser level. If you reject cookies, you may still use our site, but your ability to use some features or areas of our site may be limited. As described in this Privacy Notice, Blue Shield and third parties on our digital propert(ies) may use cookies and similar tracking technologies to collect information and infer your interests for interest-based advertising purposes.[19]

77.     With respect to information sharing, Blue Shield likewise did not disclose that it employs Tracking Technologies to share Health Information. Specifically, Blue Shield represented in its privacy policy as to Information Sharing:

> We do not sell your personal information. Any personal information you provide on our website or App will be used only in ways consistent with this, the HIPAA and the GLBA Privacy Notices, and in accordance with applicable laws and regulations.[20]

78.     Blue Shield's Evidence of Coverage further represented that it would protect members' Health Information. Specifically Blue Shield stated that it: "protects the privacy of individually-identifiable personal information, including protected health information. Individually-identifiable personal information includes health, financial, and/or demographic information - such as name, address, and Social Security number. Blue Shield will not disclose this information without authorization, except as permitted or required by state or federal law."

79.     Blue Shield also represented in its 2023 year-end "Mission Report" that it would "carefully [protect] members' data" and that it was a participant in the California Statewide Data Sharing Agreement ("DSA").[21]

---

[19] https://www.blueshieldca.com/en/home/about-blue-shield/privacy-and-security/online-mobile-privacy-notice (last accessed May 5, 2025).

[20] *Id.*

[21] https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Blue-Shield-of-California-

80.    The DSA contains numerous standards and requirements for participants, such as Blue Shield, concerning the use, security procedures, and sharing of individual personal and health information. Blue Shield made public statements concerning their participation in the DSA and indeed is listed as a signatory/participant in the associated California Government Directory.[22]

81.    The DSA codifies and memorializes existing duties on the part of participants like Blue Shield in setting forth security and data sharing standards including requirements for responses to data breaches. Among other factors, the agreement states as follows:

> Breaches can be very serious events with potential for serious impact on Participants and the individuals whose Health and Social Services Information is breached. This policy requires each Participant to identify, notify, investigate and mitigate any Breach and, when detection of a Breach has occurred, to notify CDII and any Participants impacted by the Breach in accordance with the procedures herein. This policy shall be effective as of January 31, 2024.[23]

82.    Pursuant to the DSA, as to third party technology, Blue Shield was required to "have agreements in place that require Third-Party Technology vendors (i) to provide reliable, stable, and secure services to the Participant [Blue Shield], and (ii) to adhere to the same or similar privacy and security standards applicable to the Participant pursuant to this Agreement"[24]

83.    Blue Shield also agreed, in a section entitled "Minimum Necessary," that "[a]ny use or disclosure of PHI or PII pursuant to this Agreement will be limited to the minimum PHI or PII necessary to achieve the purpose for which the information is shared'"[25]

84.    By signing on to the DSA and advertising its participation in the program, Blue Shield represented that it would use and employ data sharing and security practices and procedures consistent with the requirements of the DSA. Blue Shield therefore had a duty to abide by those same standards.

---

2023-Mission-Report.pdf (last accessed May 5, 2025).

[22] *See* https://www.cdii.ca.gov/wp-content/uploads/2023/06/DxF_DSA_SignatoryList.xlsx (last accessed May 5, 2025).

[23] https://www.cdii.ca.gov/wp-content/uploads/2023/12/CalHHS_Breach-Notification-PP_Final_v1.0.1_12.11.23.pdf (last accessed May 5, 2025).

[24] https://www.cdii.ca.gov/wp-content/uploads/2023/01/1.-CalHHS_DSA_Final_v1_7.1.22-11.8.22.pdf, at 7 (last accessed May 5, 2025).

[25] *Id.* at 5.

CLASS ACTION COMPLAINT

85.    As set forth above, investigation reveals that Blue Shield was using not only Google Analytics and Google Ads, but also a vast surveillance ecosystem of third-party Tracking Technologies embedded across its websites.

86.    Because Tracking Technologies unavoidably transmit protected information to third parties when installed on pages where sensitive communications and interactions occur, Blue Shield had a duty not to install them where Health Information was entered in the first instance. Blue Shield had an obligation to protect the Health Information collected in light of the sensitivity of the information it administered and to ensure that it did not inappropriately abrogate that obligation.

87.    Blue Shield failed in its duty to protect and use reasonable security measures to protect member data, including the DSA standards, by its own deliberate actions, and through its negligence in failing to understand and/or monitor the information being disclosed from its websites. Blue Shield consciously and deliberately violated members' rights to privacy, including laws which preclude unauthorized third parties from intercepting the contents of communications without the consent of all parties and/or for a criminal or tortious purpose such as distributing protected Health Information in violation of HIPAA's statutory requirements.

88.    Blue Shield did not provide sufficiently "secure services," nor did it adhere to the "privacy and security standards applicable to the Participant." Blue Shield's actions clearly contradict its representation that it would only provide the "Minimum Necessary" disclosure of Plaintiffs' protected information. Plaintiffs and Class members' Health Information cannot be a *necessary* disclosure to Tracking Technologies owned and controlled by third parties, nor was such information shared with the knowledge and approval of members as it was used for advertising and other purposes beneficial to third parties, rather than in connection with the provision of *any* medical services.

**B.    <u>Blue Shield Compounded the Damage it Caused by Failing to Timely Notify Members of the Data Breach</u>**

89.    While Blue Shield has provided a notice as to unauthorized disclosure and breach of Health Information to Google (albeit untimely and deficient), it has failed to do the same

regarding its unauthorized disclosures and data breaches to other entities, and it has failed to acknowledge the full extent of its breach.

90.    As set forth above, Blue Shield never adequately disclosed its use of Tracking Technologies and hid the full extent of their operation, even in the Google Data Breach Notice.

91.    The DSA sets forth several Data Breach Notification requirements, many of which Blue Shield has violated as laid out by the subsection on "Breach Notification" which became effective on January 31, 2024.[26]

92.    It required Blue Shield, "[a]s soon as reasonably practicable after discovering a breach has occurred…[to] notify CDII and all Participants impacted by the breach." At best, Defendant waited at least two months after they were notified of the breach to send any kind of notification to impacted members.

93.    It required Blue Shield, "[a]s soon as reasonably practicable after discovering a Breach has occurred... [to] provide a written report of the Breach to all Participants impacted by the Breach. . . [and] supplement the information contained in the written report as it becomes available and shall cooperate with other impacted Participants... Such written report should include, to the extent available, the following information:

      i.    One or two sentence description of the breach;

      ii.    Description of the roles of the people involved in the Breach (e.g., employees, service providers, unauthorized persons);

      iii.    The type of Health and Social Services Information Breached;

      iv.    Participants likely impacted by the Breach;

      v.    Number of individuals or records impacted/estimated to be impacted by the breach;

      vi.    Actions taken by the participant to mitigate the Breach;

      vii.    Current status of the Breach (under investigation or resolved); and

      viii.    Corrective action taken and steps planned to prevent a similar Breach."[27]

---

[26] https://www.cdii.ca.gov/wp-content/uploads/2023/12/CalHHS_Breach-Notification-PP_Final_v1.0.1_12.11.23.pdf (last accessed May 5, 2025).

[27] *Id.*

CLASS ACTION COMPLAINT

94.     Blue Shield has not described how the Tracking Technologies on its websites were configured to collect PHI and PII nor any actions that it has taken to mitigate the data breach. Indeed, the *entirety* of the section on Blue Shield's Data Breach Notice describing "What we are doing" reads as follows:

> **What we are doing:**
>
> We understand receiving a notice such as this can create concern, and we regret that member personal information may have been shared without authorization. Blue Shield takes the security of member information very seriously, and we are committed to maintaining their privacy.[28]

95.     The Notice did not describe *any* efforts to retrieve or ensure the deletion of members' PHI and PII, any efforts to stop or stem downstream effects from data which may have been sold to additional third parties, or even discuss any internal changes to security policy and practices as a result of the breach. Blue Shield did not outline any corrective action taken or steps planned to prevent a similar breach in the future or efforts to stop Google from using information already shared.

96.     A potentially compliant data breach letter would have provided at minimum the information listed above. Blue Shield's failure to do so hampers Plaintiffs' and Class members' ability to effectively respond to the breach, and has created confusion, a sense of diminished control over individual privacy and dignitary rights, and otherwise harmed the Class.

97.     Once Blue Shield became aware of the breach, it should have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms, including taking *any* steps whatsoever to attempt to mitigate the harm caused by the breach.

## VI.    Plaintiffs Did Not Consent to Blue Shield's Conduct and Were Harmed

98.     Plaintiffs took reasonable steps to maintain the confidentiality of their Health Information.

99.     Plaintiffs were required to provide Health Information to Blue Shield, including via its websites, in order to access the services they paid for. The Tracking Technologies deployed on the Blue Shield websites were not visible to an ordinary visitor to the websites and their operation

---

[28] https://news.blueshieldca.com/notice-of-data-breach (last accessed May 5, 2025).

CLASS ACTION COMPLAINT

was not adequately disclosed. Plaintiffs had no reason to believe that Blue Shield would share their medical information with unauthorized third parties.

100.    Plaintiffs were harmed by Blue Shield's conduct. Their well-recognized longstanding privacy rights were violated. They lost control over communications that should not have been accessible to third parties and over information that Blue Shield should not have shared for any purpose other than those expressly authorized by law, contrary to Blue Shield's Privacy and Security Policies and other representations, and certainly not to further third parties' advertising and other business interests. Blue Shield and others benefited from misuse of Plaintiffs' information that should not have been disclosed to third parties, while Plaintiffs lost the benefit of their bargain with Blue Shield and must face the consequences and costs of Blue Shield doing so.

101.    The compromised Health Information that Blue Shield disclosed to a wide variety of unauthorized third parties, whose own data security practices are unknown and were not disclosed to members, is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information goes to the core of members' identities and contains highly sensitive and personal information. An individual's medical history, governmental identification, employment history, and familial associations cannot be replaced or altered like a credit card number. The loss of all this data puts members at additional risk for potential fraud, phishing, harassments, discrimination, and identity theft.

102.    In addition, Plaintiffs' information constitutes Plaintiffs' property and has marketable value.[29] Blue Shield's use of Tracking Technologies allowed it and the unauthorized

---

[29] *See e.g.*, Alessandro Acquisti, Curtis Taylor, and & Liad Wagman, The Economics of Privacy, 54 J. OF ECON. LITERATURE 442, 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf (noting "obvious and substantial economic value."); The World's Most Valuable Resource is No Longer Oil, but Data, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-nolonger-oil-but-data (comparing the digital market for user data to be analogous to the oil industry); SHOSHANA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM, 166 (2019) (explaining that revenue from user data pervades every economic transaction in the modern economy); Paul M. Schwartz, Property, Privacy, and Personal Data, 117 HARV. L. REV. 2055, 2056-57 (2004) ("[t]he monetary value of personal data is large and still growing….Companies

CLASS ACTION COMPLAINT

third parties obtaining Plaintiffs' information to misappropriate the data and diminish its value. There are market exchanges where individuals, like Plaintiffs and Class members, can sell or monetize their own data.[30] For example, Nielsen Data, Killi, DataCoup, AppOptix and Mobile Computer will pay users for their data, typically with robust privacy protections for sensitive data such as that at issue here. Similarly, Google has programs that pay users for their data. This includes a program called Screenwise – an opt-in panel that can be installed on the Chrome Browser and permit Google to track and record individuals' browsing history in exchange for payment.[31] Nielsen, UpVoice, HoneyGain, and SavvyConnect are all additional companies that pay for browsing history information.

103.    Blue Shield's actions have not only harmed Plaintiffs and Class members directly, they are also harming society. "The prospect of releasing highly sensitive [protected health information (PHI)] can result in medical mistrust and the deterioration of the confidential, safe environment that is necessary to quality health care, a functional health care system, and the public's health generally." "[A]n individual's lack of trust in their health care provider to maintain the confidentiality of the individual's most sensitive medical information and a lack of trust in the medical system more generally may have significant repercussions for the public's health more generally."[32]

## CLASS ACTION ALLEGATIONS

104.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class and Subclass:

---

view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information").

[30] *See e.g.,* Kevin Mercandante, *Ten Apps for Selling Your Data for Cash,* BEST WALLET HACKS (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/ (last accessed May 5, 2025).

[31] Jack Marshall, *Google Pays Users for Browsing Data,* DIGIDAY (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/ (last accessed May 5, 2025).

[32] See HIPAA Privacy Rule To Support Reproductive Health Care Privacy, U.S. DEP'T OF HEALTH AND HUM. SERV. (Apr. 17, 2023), https://www.federalregister.gov/documents/2023/04/17/2023-07517/hipaa-privacy-rule-tosupport-reproductive-health-care-privacy (last accessed May 5, 2025).

**Nationwide Class**

All current and former United States members of Blue Shield of California whose Health Information was collected by Tracking Technologies from Blue Shield of California websites.

**Subclass**

All current and former United States members of Blue Shield of California whose Health Information was collected by Tracking Technologies from Blue Shield of California websites while such member was a California resident.

105.    Excluded from the Nationwide Class and Subclass are counsel for Plaintiffs, Defendant, its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them has a controlling interest, any entity who owns any Tracking Technology and has a controlling interest, and any entity who owns any Tracking Technology's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Nationwide Class and Subclass are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

106.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3). This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

107.    **Numerosity.** The proposed Class and Subclass are so numerous that individual joinder of all members is impracticable. While the exact number of Class members is currently unknown and can only be ascertained through appropriate discovery, Plaintiffs, on information and belief, allege that the Class and Subclass include at least hundreds of thousands of members in light of it having six million members and because members must use Blue Shield's websites to access services from Blue Shield, including to convey information to Blue Shield for their medical files.

108.    **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class members. These common questions, which do not vary among Class members and which may be determined without reference to any Class member's individual circumstances, include, but are not limited to:

a. Whether Blue Shield acted willfully or intentionally when it installed Tracking Technologies on its websites;

b. How Blue Shield and other third parties configured Tracking Technologies on Blue Shield websites;

c. Whether Blue Shield acted willfully or intentionally to the extent that it configured Tracking Technologies on its websites as it did;

d. Whether Blue Shield knew or should have known that the Tracking Technologies it installed on its websites would collect Plaintiffs' and Class members' Health Information;

e. Whether Blue Shield knew or should have known that the Tracking Technologies would intercept communications exchanged between Blue Shield and members contemporaneously with their transmission;

f. Whether Blue Shield knew or should have known that Tracking Technologies would collect Plaintiffs' and Class members' Health Information without their knowledge or consent;

g. Whether Blue Shield was negligent in allowing Tracking Technologies to collect Plaintiffs' and Class members' Health Information;

h. What benefits Blue Shield received from third parties in exchange for the disclosure of Plaintiffs' and Class members' Health Information;

i. Whether Blue Shield took adequate and reasonable measures to ensure that Health Information would not be collected by unauthorized third parties;

j. Whether Blue Shield took available steps to prevent Tracking Technologies from the unauthorized collection of Health Information, or to mitigate the risk by demanding that third parties return and delete such information;

k. Whether Blue Shield unreasonably delayed in notifying Plaintiffs and Class members of unauthorized collection of Health Information and the harm they suffered once Blue Shield knew or suspected that third parties had collected this information;

l.      Whether Blue Shield owed a legal duty to Plaintiffs and Class members to protect their Health Information;

m.      Whether Blue Shield breached any duty to protect the personal information of Plaintiffs and Class members by failing to exercise due care in protecting their Health Information;

n.      Whether Plaintiffs and Class members were harmed as a the result of Blue Shield's actions and inactions as alleged herein;

o.      Whether Plaintiffs and Class members are entitled to actual, statutory, punitive or other forms of damages and other monetary relief; and,

p.      Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief or restitution.

109.    **Typicality.** Plaintiffs' claims are typical of other Class members' claims because Plaintiffs and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

110.    **Adequacy of Representation.** Plaintiffs are adequate class representatives because they are Nationwide Class members, California Subclass members, and their interests do not conflict with Class interests. Plaintiffs retained counsel who are competent and experienced in class action litigation, data breach litigation, and litigation concerning the privacy interests at stake in this action. Plaintiffs and their counsel intend to prosecute this vigorously action on behalf of all Class members and will fairly and adequately protect their interests.

111.    **Predominance and Superiority.** The Class and Subclass can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class member's claim is impracticable. Even if each Class member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among

those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

112.    **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

113.    Tolling: Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the conduct and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and Class members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

114.    Plaintiffs and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was acting unlawfully and in the manner alleged herein. As alleged herein, the representations made by Defendant were material to Plaintiffs and Class members at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence the alleged wrongful conduct.

115.    Defendant is and was under a continuous duty to protect and secure the data at issue, and to timely notify Plaintiffs and Class members of any data breach, particularly in light of the sensitivity of Health Information as a category, privacy expectations rooted in federal and state law regarding such information, the invisibility of Tracking Technologies on Defendant's websites, at all times; Defendant's intentional deployment of the Tracking Technologies on its websites; Defendants' promises to employ adequate security measures and safeguard members' information;

1   and Defendant's unique knowledge regarding Health Information that was transmitted via Tracking

2   Technologies.

3         116.    Defendant knowingly, actively, affirmatively and/or negligently concealed the facts

4   alleged herein. Plaintiffs and Class members reasonably relied on Defendant's concealment.

5         117.    Further, Defendant's unlawful use of Tracking Technologies, and any resulting

6   monetization of Plaintiffs and Class members' Health Information was done in a manner

7   undetectable to members. As a result, Plaintiffs' and Class members' could not and did not discover

8   the misconduct described herein.

9         118.    Plaintiffs only became aware of Defendant's wrongdoing shortly before the filing

10   of this complaint as a result of Defendant's untimely and insufficient Google Data Breach Notice,

11   and through counsel's investigation.

12         119.    For these reasons, all applicable statutes of limitation have been tolled based on the

13   discovery rule and Defendant's concealment, and Defendant is estopped from relying on any

14   statutes of limitations in defense of this action.

## CAUSES OF ACTION

### COUNT ONE
### California Constitutional Invasion of Privacy
### (On behalf of California Subclass)

18         120.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

19         121.    The California Constitution provides that "All people are by nature free and

20   independent and have inalienable rights. Among these are enjoying and defending life and liberty,

21   acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and

22   privacy." Cal. Const. art. I, § 1.

23         122.    At all relevant times, Plaintiffs and Class members had a constitutionally protected

24   interest in precluding the dissemination and misuse of their personal and private information,

25   including Health Information, and in making intimate personal decisions and communicating with

26   Blue Shield without observation, intrusion or interference by others.

         CLASS ACTION COMPLAINT

123.    Plaintiffs and Class members did not consent or authorize Blue Shield to disclose their personal and private communications and information to third parties through the use of Tracking Technologies as described herein.

124.    Plaintiffs and Class members enjoyed objectively reasonable expectations of privacy surrounding their Health Information, and in using communication devices to exchange communications and information on the Blue Shield websites, as evidenced by, among other things, federal, state and common laws that uphold the confidentiality of such information and that require lawful consent prior to disclosures. A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas recognized and protected.

125.    Blue Shield violated Plaintiffs' and Class members' constitutional privacy rights by deploying Tracking Technologies on the Blue Shield websites in the manner alleged herein.

126.    Blue Shield's conduct is a serious intrusion of Plaintiffs' and Class members' privacy because Blue Shield acted intentionally in installing Tracking Technologies on its websites, in configuring those operations of the Tracking Technologies that Blue Shield had the ability to configure; in setting the policies and practices by which Blue Shield permitted and failed to monitor the dissemination of private information from the Blue Shield websites; and in intruding on Plaintiffs' and Class members' communications, which constitute private conversations, matters, and data.

127.    Blue Shield's conduct was highly offensive because, among other things, it occurred in circumstances where a person would reasonable expect their communications and information to remain private; violated federal and state law designed to protect patient privacy, including but not limited to HIPAA and the CMIA; and violated the express promises that Blue Shield made to Plaintiffs and Class members.

128.    Plaintiffs and Class members seek injunctive and equitable relief for Blue Shield's violations of their constitutional rights. The Court should issue an order prohibiting Blue Shield from engaging in the unlawful use of Tracking Technologies now and moving forward, requiring Blue Shield to recover and/or ensure the destruction of all of the Health Information improperly collected by third parties, from all knowable repositories in the possession, custody, or control of

CLASS ACTION COMPLAINT

all ascertainable entities; to implement safeguards and privacy-by-design practices sufficient to ensure future compliance with federal and state laws; to provide accurate and complete disclosures to members regarding historical and forward-looking data collection and sharing practices; and other equitable relief.

129.    Because Blue Shield's invasion of Plaintiffs' and Class members' privacy took something of value from Plaintiffs and Class members, and Blue Shield derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value, Plaintiffs and Class members also seek disgorgement of the financial value of the benefits that Blue Shield unconstitutionally obtained, and such other relief as the Court may deem just and proper.

**COUNT TWO**
**California Invasion of Privacy Act ("CIPA") Cal. Penal Code § 631, *et seq.***
**(On behalf of Nationwide Class and California Subclass)**

130.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

131.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose.

> The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

132.    California Penal Code § 631(a) provides, in pertinent part (emphasis added):
> Any person who, by means of any machine, instrument, or contrivance, or in any other manner ... willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, **or who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)

133.    At all relevant times, Blue Shield aided, employed, agreed with, and conspired with other persons, including, but not limited to, Google, Meta, LinkedIn, TikTok, NextAdRroll, OpinionLabVerint, Marketo, Adelphic (now owned by Viant), Dynatrace, and Adobe to track and intercept Plaintiffs' and Class members' internet communications while they were in transit. Each of Blue Shield's acts and omissions that caused this result was willful.

134.    Blue Shield failed to disclose its use of Tracking Technologies would automatically and simultaneously transmit Plaintiffs' and Class members' communications to Google and other undisclosed third-parties.

135.    The Tracking Technologies deployed on Blue Shield websites has at all relevant times been invisible to Plaintiffs and Class members, and has at all relevant times been under the exclusive control of Blue Shield and the third parties that develop, update, and maintain them, including where they are embedded, what information is tracked and transmitted, how events are categorized prior to their transmission, and how the data is used subsequent to its receipt.

136.    The communications exchanged between Plaintiffs and Class members, on the one hand, and Blue Shield, on the other hand, were transmitted to and intercepted during the communication and without the knowledge, authorization, or consent of Plaintiffs and Class members. Plaintiffs and Class members reasonably understood and expected that Blue Shield would not disclose information that is protected from disclosure by law, including when such information took the form of communications on the Blue Shield websites.

137.    The Tracking Technologies constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner":

        a.    Plaintiffs' and Class members' browsers;

        b.    Plaintiffs' and Class members' computing devices and mobile devices;

        c.    Tracking Technologies used to collect and track members' communications;

        d.    Blue Shield's web-servers; and

        e.    The Tracking Technologies deployed by Blue Shield to effectuate the sending and acquisition of member communications.

138.    Google and other unauthorized third parties would not have intercepted or received the contents of Plaintiffs' and Class members' communications but for Blue Shield's actions and inactions alleged herein.

139.    As a result of these violations, and pursuant to CIPA section 637.2, Blue Shield is liable to Plaintiffs and Class members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for an amount of $5,000 per violation. Section 637.2 specifically states that: "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

140.    Under the statute, Blue Shield is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

141.    Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT THREE
### Negligence
### (On behalf of Nationwide Class and California Subclass)

142.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

143.    Plaintiffs were required to provide Health Information as a precondition for receiving insurance services from Defendant, and were required to use Blue Shield's websites in order to fully access and use those services. Plaintiffs and Class members entrusted their Health Information to Defendant with the understanding that it would safeguard this information.

144.    Defendant made numerous promises regarding its data security measures including that it was a participant in the DSA, which provides certain data sharing requirements and standards. This included representations it would minimize unnecessary data sharing with third party vendors.

145.    Defendant had full knowledge of the sensitivity of the Health Information that it stored and the types of harm that Plaintiffs and Class members could and would suffer if that information were wrongfully disclosed.

146.    Defendant processes sensitive information for millions of members and has annual revenue in the tens of billions of dollars. Defendant had the financial and personnel resources

necessary to adequately secure the information exchanged on its websites. Defendant nevertheless failed to adopt reasonable data security measures, in breach of the duties it owed to Plaintiffs and Class members.

147. Defendant's duty to implement and maintain reasonable security procedures and practices includes, among other things, a duty to design, maintain, and test Defendant's and Defendant's contractors' information security controls sufficiently rigorously to ensure that Health Information in its possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, properly configuring source codes, notifying patients of the specific breached data in a timely manner, and remedying the continuing harm.

148. Defendant's duty of care arose from, among other things:

a. California Constitution, Cal. Const. art. I, § 1;

b. Defendant's ability (and Plaintiffs' and Class members' inability) to ensure that its use of Tracking Technologies did not collect or share Health Information with third parties, and were sufficient to protect the Health Information they collected;

c. Defendant's position of trust with respect to Plaintiffs and Class members that entrusted their private information to Defendant;

d. Defendant's contractual and other commitments to maintain reasonable cybersecurity and privacy safeguards for Health Information and any other contractual obligations described herein;

e. Section 5 of the FTC Act, 15 U. S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures;

f. Defendant's participation in the DSA, including its assent to follow numerous data security measures outlined in the agreement. The DSA expressly discusses the risk of data breaches in the health industry and the impact that exposure of this information may have

on individual members. One of the plain purposes of the DSA is to ensure insurers, like Defendant, follow and enact sufficient data security practices and procedures; and

g.    Defendant's common law duties to adopt reasonable data security measures to protect customer Health Information and to act as a reasonable and prudent person under the same or similar circumstances would act.

149.    Defendant failed in all respects. Defendant, through its actions and inactions, breached its duty owed to Plaintiffs and Class members by failing to exercise reasonable care in safeguarding their Health Information while it was in its possession and control. Defendant inadequately safeguarded members' Health Information in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

150.    Defendant made its websites insecure and did not take reasonable and appropriate safeguards to protect Plaintiffs' and Class members' Health Information from disclosure to unauthorized third parties. Defendant did not take reasonable and appropriate steps to ensure that information disclosed via Tracking Technologies was used only in compliance with applicable law and consistent with Defendant's representations. It was not a reasonable security procedure and practice for Defendant to configure its websites in such a way that member Health Information could be disclosed for years to unauthorized third parties that would use protected information for purposes not authorized by law.

151.    Defendant also breached its obligations under the DSA. Defendant did not ensure adequate security practices in that it did not vet or otherwise sufficiently verify that third-party Tracking Technologies were appropriate for use on all parts of its websites where they were deployed, and did not monitor the operation of Tracking Technologies, which can be amended by the third parties that operate and control them, adequately to ensure that protected communications and information were not being disclosed.

152.    Defendant's violation of the California Constitution and the FTC Act constitutes negligence per se for purposes of establishing the duty and breach elements of this negligence claim. Those statutes were designed to protect a group to which Plaintiffs belong and to prevent the types of harm that resulted from the data breach.

153.    Plaintiffs and Class members were the foreseeable victims of Defendant's inadequate data security. Defendant knew that a breach of its systems or its contractors' systems could and would cause harm to Plaintiffs and Class members.

154.    Defendant's conduct created a foreseeable risk of harm to Plaintiffs and Class members. Defendant's conduct included its failure to adequately mitigate harm through negligently failing to timely inform members of the Google Analytics data breach, and failing to inform as to all other breaches by third-parties.

155.    There is a temporal and close causal connection between Defendant's failure to implement adequate data security measures and notification practices, the data breach and the harms suffered by Plaintiffs and Class members.

156.    But for Defendant's breach of its duty to adequately protect Plaintiffs' and Class members' Health Information, that information would not have been breached.

157.    Defendant's breaches of one or more of its duties was a substantial factor in causing harms, injuries, and damages to Plaintiffs and Class members as alleged herein.

158.    Plaintiffs and Class members seek injunctive and equitable relief for Blue Shield's negligence. The Court should issue an order prohibiting Blue Shield from engaging in the unlawful use of Tracking Technologies now and moving forward, requiring Blue Shield to recover and/or ensure the destruction of all of the Health Information improperly collected by third parties, from all knowable repositories in the possession, custody, or control of all ascertainable entities; to implement safeguards and privacy-by-design practices sufficient to ensure future compliance with federal and state laws; to provide accurate and complete disclosures to members regarding historical and forward-looking data collection and sharing practices; and other equitable relief.

159.    Plaintiffs and Class members also seek monetary damages for the harm proximately caused by Defendant's breach of its duties, and such other relief as the Court may deem just and proper.

**COUNT FOUR**
**Breach of Express Contract – Evidence of Coverage**
**(On behalf of Nationwide Class and California Subclass)**

160.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

161.    There exists an express contract between Plaintiffs and Class members, on the one hand, and Blue Shield, on the other hand: the Evidence of Coverage contract ("EOC"). The EOC provides that information within it "is part of the contractual agreement between the Subscriber and Blue Shield."

162.    Under the EOC, Blue Shield promises that it "protects the privacy of individually-identifiable personal information, including protected health information" and that it will not disclose this information without authorization.

163.    In exchange for Blue Shield's provision of health insurance services, along with its promise to keep its members' Health Information confidential, Plaintiffs and Class members provided Blue Shield with their Health Information and paid their respective premiums.

164.    Plaintiffs and Class members fully performed their obligations under the express contract with Defendant.

165.    Blue Shield materially breached its express contract with Plaintiffs and Class members by disclosing to third-party marketing companies Plaintiffs' and Class members' Health Information, thereby failing to protect the privacy of its members' Health Information as it promised to do.

166.    The Health Information Blue Shield discloses is not publicly accessible click or browsing data. Instead, Health Information that Plaintiffs and Class members reasonably thought was being transmitted "securely" to Blue Shield was being disclosed by Blue Shield to unauthorized third parties.

167.    Blue Shield has failed and refused to cure these breaches and continues to disclose to Health Information.

168.    Blue Shield's breach caused Plaintiffs and Class members the following damages:

a.    Nominal damages for each breach of contract by Defendant;

b.      General damages for invasion of Plaintiffs' and Class members' rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.      Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private;

d.      Defendant eroded the essential confidential nature of the health-insurer/member relationship;

e.      Defendant took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value;

f.      Plaintiffs and Class members did not get the full value of the health insurance services for which they paid, which included Defendant's duty to maintain confidentiality;

g.      Defendant's actions diminished the value of Plaintiffs' and Class members' personal information;

h.      Defendant's actions violated the property rights Plaintiffs and Class members enjoy in their private communications; and

i.      Defendant's actions violated the property rights Plaintiffs and Class members enjoy in their Health Information.

**COUNT FIVE**
**Breach of Express Contract – Blue Shield Terms of Use**
**(On behalf of Nationwide Class and California Subclass)**

169.      Plaintiffs hereby incorporate the factual allegations set forth above by reference.

170.      There exists an express contract between Plaintiffs and Class members, on the one hand, and Blue Shield, on the other hand: The Blue Shield Terms of Use ("BS Terms").

171.      The BS Terms state "By using this site and the links accessible through this site, you expressly agree to be bound by these terms and conditions and any other terms and conditions set out throughout the site."

172.      The BS Terms also incorporate by reference its Internet Privacy Policy, stating "All personal information that you, as a site user, provide on this site is handled and protected as set

forth in Blue Shield of California's Internet Privacy Policy, which is incorporated here by this reference." Therefore, the Internet Privacy Policy is part of the express contract.[33]

173.    In its Internet Privacy Policy, Blue Shield makes many promises:

a.    "We at Blue Shield respect your privacy and we work hard to protect the information you provide online."; and

b.    "Any personal information you provide on our website or App will be used only in ways consistent with this, the HIPAA and the GLBA Privacy Notices, and in accordance with applicable laws and regulations."

174.    In exchange for Blue Shield's provision of health insurance services and its promise to keep its members' Health Information confidential, Plaintiffs and Class members provided Blue Shield with their Health Information, including by logging in to Blue Shield's website, and paid their respective premiums.

175.    The Blue Shield websites are not a service Blue Shield provides without receiving anything from Plaintiffs in return. To the contrary, Plaintiffs pay for full access, and their use of the websites confers a significant benefit upon Blue Shield including, but not limited to, increased efficiency, optimized workflow, and cost reduction. As just one example, when patients use the Blue Shield websites to access their Health Information, it reduces the need for Blue Shield to individually answer questions about coverage.

176.    Plaintiffs and Class members fully performed their obligations under the express contract with Defendant.

177.    Blue Shield materially breached its express contract with Plaintiffs and Class members by disclosing to third-party marketing companies Plaintiffs' and Class members' Health Information, thereby failing to protect the privacy of its members' Health Information as it promised to do.

---

[33] While the BS Terms refer to an Internet Privacy Policy, it appears no such document on Blue Shield's websites is titled as such. Rather, Blue Shield's website contains an Online and mobile privacy notice.

CLASS ACTION COMPLAINT

1   178.   The Health Information Blue Shield discloses is not publicly accessible click or

2   browsing data. Instead, Health Information that Plaintiffs and Class members reasonably thought

3   was being transmitted "securely" to Blue Shield was being disclosed by Blue Shield to unauthorized

4   third parties.

5   179.   Blue Shield has failed and refused to cure these breaches and continues to disclose

6   to Health Information.

7   180.   Blue Shield's breach caused Plaintiffs and Class members the following damages:

8          a.      Nominal damages for each breach of contract by Defendant;

9          b.      General damages for invasion of Plaintiffs' and Class members' rights in an

10  amount to be determined by a jury without reference to specific pecuniary harm;

11         c.      Sensitive and confidential information that Plaintiffs and Class members

12  intended to remain private is no longer private;

13         d.      Defendant eroded the essential confidential nature of the health-

14  insurer/member relationship;

15         e.      Defendant took something of value from Plaintiffs and Class members and

16  derived benefit therefrom without Plaintiffs' and Class members' knowledge or informed consent

17  and without sharing the benefit of such value;

18         f.      Plaintiffs and Class members did not get the full value of the health insurance

19  services for which they paid, which included Defendant's duty to maintain confidentiality;

20         g.      Defendant's actions diminished the value of Plaintiffs' and Class members'

21  personal information;

22         h.      Defendant's actions violated the property rights Plaintiffs and Class

23  members enjoy in their private communications; and

24         i.      Defendant's actions violated the property rights Plaintiffs and Class

25  members enjoy in their Health Information.

26

27

28

CLASS ACTION COMPLAINT

**COUNT SIX**
**Breach of Implied Contract**
**(On behalf of Nationwide Class and California Subclass)**

181.    Plaintiffs hereby incorporate the factual allegations set forth above by reference, except for those paragraphs that fall under counts four and five immediately above for breach of express contract.

182.    Plaintiffs assert this claim in the alternative to their claims for breach of express contract, insofar as the contracts are found not to be binding and enforceable and/or insofar as the promises alleged herein are not expressly included in enforceable express contracts.

183.    Plaintiffs and Class members were required to provide Health Information to Defendant as a precondition for receiving health insurance services, and were required to use Blue Shield's websites in order to access and use those services. Substantial cost savings inured to Defendant as a result of requiring that members use its online services which Defendant would not have received if it had provided the same services exclusively by telephone or in person. As part of this exchange, there was an implied contract that, in accepting custody of Health Information via the Blue Shield websites, Defendant would safeguard and protect the Health Information from unauthorized disclosures, and would timely and accurately notify Plaintiffs and Class members if the data was breached or compromised.

184.    Plaintiffs and Class members entered into this implied contract with the reasonable expectation that, in exchange for the money paid by members directly or through another collateral source, and in exchange for the online access granted by members to their Health Information, Defendant's services would utilize data security practices and policies consistent with legal requirements, industry standards, and Defendant's own representations. This includes the reasonable expectation, based on Defendant's own Privacy Policy and Security Policy, that Health Information would not be shared to any third parties without members' consent.

185.    Plaintiffs and Class members would not have provided and entrusted their Health Information to Defendant as they did, would have paid less for Defendant's products or services, and would have required Defendant to incur higher costs to provide its services, in the absence of

the implied contract or implied terms between them and Defendant. The safeguarding of Health Information was critical to realize the intent of the parties.

186.    Plaintiffs and Class members fully performed their obligations under the implied contract with Defendant.

187.    Defendant breached the implied contract to protect Health Information when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) configured its websites in a way that disclosed that information to unauthorized third-party advertising services for years; and (3) failed to notify Plaintiffs and Class members of the specific data breached in a reasonable and timely manner.

188.    Blue Shield's breach of implied contract caused Plaintiffs and Class members the following damages:

a.    Nominal damages for each breach of contract by Defendant;

b.    General damages for invasion of Plaintiffs' and Class members' rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.    Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private;

d.    Defendant eroded the essential confidential nature of the health-insurer/member relationship;

e.    Defendant took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value;

f.    Plaintiffs and Class members did not get the full value of the health insurance services for which they paid, which included Defendant's duty to maintain confidentiality;

g.    Defendant's actions diminished the value of Plaintiffs' and Class members' personal information;

h.    Defendant's actions violated the property rights Plaintiffs and Class members enjoy in their private communications; and

- 45 -

i.    Defendant's actions violated the property rights Plaintiffs and Class members enjoy in their Health Information.

189.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT SEVEN**
**Electronic Communications Privacy Act ("ECPA") 18 U.S.C. § 2510, *et seq.***
**(On behalf of Nationwide Class and California Subclass)**

190.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

191.    The Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

192.    In relevant part, the ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

193.    The ECPA protects both sending and receipt of communications.

194.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

195.    The transmissions of Plaintiffs' Health Information via Blue Shield's use of Tracking Technologies on the Blue Shield websites, includes "communications" under the ECPA's definition in 18 U.S.C. § 2510(12).

196.    **Electronic Communications**. The transmission of Health Information between Plaintiffs and Class members and Blue Shield via its websites are "transfer[s] of signs, signals, writing,... data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

197.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

198.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or

other device" and "contents ... include any information concerning the substance, purport, or meaning of that communication." 18 U. S.C. § 2510(4), (8).

199. **Electronic, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device ... which can be used to intercept a[n] ... electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

   a.  Plaintiffs' and Class members' browsers;

   b.  Plaintiffs' and Class members' computing devices and mobile devices;

   c.  Tracking Technologies used to collect and track members' communications;

   d.  Blue Shield's web-servers; and

   e.  The Tracking Technologies deployed by Blue Shield to effectuate the sending and acquisition of member communications.

200. When Plaintiffs and Class members interacted with Blue Shield's websites, where Defendant intentionally installed and embedded Tracking Technologies which contemporaneously and collected, disclosed, used, and redirected, and endeavored to disclose, use, and redirect, the contents of Plaintiffs' and Class members' electronic communications to third parties without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c)-(d).

201. Blue Shield's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs and Class members regarding the Health Information. The intercepted communications contents include, but are not limited to:

   a.  the precise content of Plaintiffs and Class members access to and communications with Blue Shield, including within authenticated portals, such as logging-in or logging out of a member portal and exchanging communications about appointments, treatments, conditions, symptoms, prescriptions, billing, benefits, and payments, or providers inside the portals;

   b.  the precise content of searches that Plaintiffs and Class members conduct on Blue Shield's websites, *e.g.,* for providers, treatments, conditions, payment information, financial assistance, dependent coverage, and more; and

             CLASS ACTION COMPLAINT

c.    the precise content of Plaintiffs and Class member access to and communications with Blue Shield on pages directed towards patients outside of the member portal, which includes communications relating to specific doctors, symptoms, conditions, treatments, prescription drugs, covered activities, and requests for appointments.

202.    By intentionally procuring Google, Meta, and other third parties to intercept the electronic communications of Plaintiffs and Class members, Blue Shield violated 18 U. S.C. § 2511(1)(a).

203.    By intentionally using electronic communications as intercepted by Google, Meta, and other third parties in violation of 18 U.S.C. § 2511(1)(a), including for advertising, Blue Shield violated 18 U. S.C. § 2511(1)(d).

204.    Blue Shield intentionally used the wire or electronic communications to increase its profit margins and to otherwise increase the overall value of Plaintiffs' communications to itself, and it specifically used the Tracking Technologies to track and utilize Plaintiffs' and Class members' Health Information for financial gain.

205.    Blue Shield was not acting under color of law when it procured the interception of Plaintiffs' and Class members' wire or electronic communication by third parties.

206.    Plaintiffs and Class members did not authorize Blue Shield to acquire the content(s) of their communications via the Tracking Technologies for purposes of invading their privacy.

207.    Plaintiffs and Class members did not authorize Blue Shield to procure Google, Meta, or any other third party to acquire the content(s) of their communications via the Tracking Technologies for purposes of invading their privacy or for any other purpose.

208.    Plaintiffs and Class members did not authorize Blue Shield to use communications intercepted by Google, Meta, or any other third party for purposes of invading their privacy or for any other purpose.

209.    Any purported consent Blue Shield received from Plaintiffs and Class members was not valid.

210.    **Unauthorized Purpose.** Blue Shield intercepted the contents of Plaintiffs' and Class members' electronic communications for the purpose of committing a tortious or criminal act

in violation of the Constitution or laws of the United States or of any State — namely, violations of HIPAA, breaches of confidence, invasion of privacy, among others.

211.   The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

212.   Blue Shield is a "party to the communication" with respect to Plaintiffs' and Class members' communications, but its simultaneous, duplication, forwarding, and facilitation of third parties' interception of Plaintiffs' and Class members' Private Information does not qualify for the party exemption.

213.   More specifically, Blue Shield's procurement of third parties to acquire, use, and disclose Plaintiffs' and Class members' communications was done for the purpose of committing criminal and tortious acts in violation of the laws of the United States and California, including:

a.   42 U.S.C. § 1320d-6;

b.   45 CFR § 164.508(a)(1);

c.   15 U.S.C. § 45;

d.   Cal. Penal Code § 631, *et seq.*;

e.   Cal. Penal Code § 638.51(a);

f.   Cal. Civ. Code § 56, *et seq.*;

g.   Cal. Bus. & Prof. Code § 17200; and

h.   The common law causes of action alleged herein.

214.   Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person ... without authorization" from the patient.

215.   The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm."  42 U.S.C. § 1320d-6.

216.   Blue Shield's conduct violated 42 U. S. C. § 1320d-6 in that it:

      a.     Used and caused to be used persistent identifiers associated with specific members without members' authorization; and

      b.     Disclosed the content of communications to third parties without members' authorization.

217.   Blue Shield's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Blue Shield's use of the Tracking Technologies was for its commercial advantage to increase revenue from existing patients and gain new patients.

218.   Blue Shield is not exempt from ECPA liability under 18 U. S. C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class members' communications because Blue Shield used its participation in these communications to improperly share content of communications with third parties that did not participate in these communications (e.g., Google, Meta, TikTok and LinkedIn) through the use of Tracking Technologies when Plaintiffs and Class members: (1) were unaware those third parties would receive the content of their communications; and (2) did not consent to those third parties receiving the content of their communications.

219.   Blue Shield accessed, obtained, and disclosed Plaintiffs' and Class members' communications for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

220.   As such, Blue Shield cannot viably claim any exception to ECPA liability.

221.   Plaintiffs and Class members have suffered damages as a direct and proximate result of Blue Shield's violation of the ECPA.

222.   As a result, Plaintiffs and Class members seek all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT EIGHT**
**Confidentiality of Medical Information Act ("CMIA") Cal. Civ. Code § 56 *et seq.***
**(On behalf of California Subclass)**

223.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

224.    The California Confidentiality of Medical Information Act (CMIA) prohibits the unauthorized disclosure of medical information; the unauthorized sharing and use of medical information for purposes not necessary to provide healthcare services; the negligent maintenance of medical information; and the negligent release of medical information. Cal. Civ. Code §§ 56.10(a), 56.10(d), 56.10(e), 56.101(a), 56.36(b).

225.    Defendant is a provider of health care under Cal. Civ. Code § 56.06, subdivisions (a) and (b), because it maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition.

226.    Defendant is therefore subject to the requirements of the CMIA.

227.    Plaintiffs and Subclass members are "Patients" under Cal. Civ. Code § 56.05(k) because they are natural persons who received health care services, and to whom the Health Information described herein pertains.

228.    **CMIA § 56.10 – Unauthorized Disclosure.** Pursuant to Section 56.10(a), "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

229.    The CMIA defines medical information as meaning any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." The information Defendant maintained and disclosed is medical information because "insurance policy/claim information" provides information about a member's medical history, and was individually identifiable because it included information such as the member's full name, full address, unique identifier, date of birth, and other information which

"alone or in combination with other publicly available information reveals the identity of the individual."

230.    Defendant intentionally placed on its websites Tracking Technologies that communicated Health Information to third parties. These Tracking Technologies permitted these third parties to obtain in real time Plaintiffs' and Class members' health communications and other information shared with Blue Shield. As a result of Blue Shield's intentional acts, unauthorized third parties viewed the Health Information disclosed by Defendant and used it for unauthorized purposes including among other things, marketing, advertising, and user profiling.

231.    As evidenced by, among other things, Defendant's Google Data Breach Notice, Defendant's disclosures were not authorized by Plaintiffs and Subclass members.

232.    In violation of Cal. Civ. Code § 56.10(a), Defendant disclosed Plaintiffs' and Subclass members' personal and Medical Information without first obtaining authorization.

233.    In violation of Cal. Civ. Code § 56.10(d), Defendant intentionally shared and otherwise used Plaintiffs' and Subclass members' Medical Information for a purpose not necessary to provide health care services to Plaintiffs or Subclass members, including for marketing, advertising, and user profiling.

234.    In violation of Cal. Civ. Code § 56.10(e), Defendant disclosed Plaintiffs' and Subclass members' Medical Information to persons or entities which were not engaged in providing direct health care services to Plaintiffs, Subclass members, their providers of health care, health care service plans, insurers, or self-insured employers.

235.    **CMIA § 56.101(a) – Failure to Preserve Confidentiality.** Pursuant to Section 56.101(a):

> Every provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36.

236.    Defendant is a covered entity who creates, maintains, preserves, stores, abandons, destroy, or disposes of medical information.

237.    In violation of the first sentence of Cal. Civ. Code § 56.101(a), Defendant created, maintained, preserved, and stored Plaintiffs' and Subclass members' Health Information in a manner that failed to preserve and breached the confidentiality of the information, including by permitting third parties access to the information communicated on its websites, which third parties then collected for its own use.

238.    Defendant's violation of the first sentence of Cal. Civ. Code § 56.101(a) was negligent in violation of the second sentence of Cal. Civ. Code § 56.101(a) because Defendant failed to adhere to best practices in the application development industry and failed to comply with the assurances it made and endorsed with respect to the privacy and security of information provided to it.

239.    Defendant's violations of Cal. Civ. Code § 56.101 caused Plaintiffs' and Subclass members' Health Information to be viewed by unauthorized persons, including by persons who work for or with Google, Meta, and other entities engaged in internet advertising and use profiling.

240.    Defendant negligently released confidential information or records concerning Plaintiffs and Subclass members—that is, their Health Information, and other personal information associated with their Health Information—as required to state a cause of action for relief under Cal. Civ. Code § 56.36(b).

241.    As a result of Defendant's violations of the above provisions of the CMIA, Plaintiffs and Subclass members are entitled to, at minimum, (1) nominal damages of $1,000 per violation pursuant to Cal. Civ. Code Section 53.36(b); (2) actual damages, in an amount to be determined at trial; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

242.    Plaintiffs also seeks such other relief as the Court may deem just and proper.

**COUNT NINE**
**California Consumer Privacy Act ("CCPA") Cal. Civ. Code § 1798.100 *et seq*.**
**(On behalf of California Subclass)**

243.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

244.     Plaintiffs plead this cause of action in the alternative to the cause of action for Defendant's violation of the CMIA.

245.     The CCPA was enacted to protect consumers' privacy by granting them control over how businesses collect, use, and disclose their personal information.

246.     Through the conducted alleged herein, Defendant violated the CCPA by subjecting Plaintiffs' and Class members' personal information to "unauthorized access and exfiltration, theft, or disclosure as a result of [Defendant's] violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information." Cal. Civ. Code § 1798.150. Upon information and belief, this personal information was nonencrypted and unredacted.

247.     Defendant is a "business" subject to the provisions of the CCPA (including Cal. Civ. Code § 1798.150), because it is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" or on the behalf of which such information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information," that "does business" California and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Cal. Civil Code § 1798.140(d)(1).

248.     Plaintiffs' and Class members' personal information was subjected by Defendants to unauthorized access and exfiltration, theft, or disclosure in the manner alleged herein, and therefore qualifies as personal information protected by the CCPA, because the information at issue includes Plaintiffs' and Class members' names and their "Medical Information," defined under the CCPA as "individually identifiable [electronic] information" regarding Plaintiffs' and Class members' "medical history or medical treatment or diagnosis by a health care professional." Cal. Civ. Code § 1798.81.5(d).

249.     Plaintiff and the Class members will seek relief under § 1798.150(a), including, but not limited to, (i) recovery of actual damages or damages in an amount not less than $100 and not greater than $750 per consumer per incident, whichever is greater, (ii) injunctive or declaratory

relief, and (iii) any other relief the Court deems proper, including attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5.

250.    Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiffs are required to provide Defendant with written notice at least 30 days prior to the commencement of an action identifying the specific provisions Plaintiffs allege have been or are being violated. In satisfaction of this requirement, Plaintiffs have sent written notice to the Defendant via certified mail before filing this Complaint.

251.    Plaintiff currently seeks only injunctive relief in the form of an order enjoining Blue Shield from continuing to violate the CCPA.

252.    If Defendant cures the noticed violations and provide Plaintiffs an express written statement that the violations have been cured within 30 days, Plaintiffs will take all necessary steps required thereto, but if Defendant fails to do so, Plaintiffs will seek actual, punitive, and statutory damages, restitution, and any other relief the Court deems proper due to Defendant's violation of the CCPA, including by seeking leave to amend the complaint.

**COUNT TEN**
**California Customer Records Act ("CRA") Cal. Civ. Code § 1798.80 *et seq.***
**(On Behalf of California Subclass)**

253.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

254.    "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

255.    Defendant is a business that owns, maintains, or licenses personal information, within the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiffs and Subclass members.

256.    Defendant violated Cal. Civ. Code § 1798.81.5 by failing to implement reasonable measures to protect Plaintiffs' and Subclass members' Health Information.

257.     Businesses that own or license computerized data that includes personal information are required to notify California residents when their Health Information has been acquired (or has reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of personal information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

258.     Defendant is a business that owns or licenses computerized data that includes personal information as defined by Cal. Civ. Code § 1798.82.

259.     Plaintiffs and Subclass members' Health Information includes personal information identified in Cal. Civ. Code § 1798.82(h) such as their names, address and date of birth, and health insurance information, and is thereby covered by Cal. Civ. Code § 1798.82.

260.     Plaintiffs and Subclass members are "customers" within the meaning of Cal. Civ. Code § 1798.80(c), as their personal information was provided to Defendant for the purpose of utilizing Defendant's healthcare insurance services.

261.     The data breach constituted a breach of Defendant's security systems, networks, and servers.

262.     Because Defendant reasonably believed that Plaintiffs and Subclass members' Health Information was acquired by unauthorized persons during the data breach, Defendant had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

263.     Defendant unreasonably delayed informing Plaintiffs and the Subclass members about the breach of security of their Health Information. Even if the breach were limited to the improper transmittal of information from Google Analytics to Google Ads services, which it is not, such transmittal is not possible without an affirmative knowing act on the part of Defendant. Defendant was thus aware no later than April 2021 of the breach, and remained aware throughout the duration. Defendant further purportedly severed the connection underlying the breach as Defendant conceives of the breach in January 2024, which also is not possible without an

affirmative knowing act. Defendant's contradictory claim to have "discovered' the breach in February 2025 is not plausible. Defendant failed to notify Plaintiffs or Subclass members until April 2025. Defendant's Google Data Breach Notice was not "made in the most expedient time possible and without unreasonable delay" as required by Cal. Civ. Code § 1798.82.

264.    Defendant still has not disclosed all entities to whom Plaintiffs' and Subclass members' Health Information was disclosed.

265.    Upon information and belief, no law enforcement agency instructed Defendant that notification to Plaintiffs and Subclass members would impede an investigation.

266.    Thus, by failing to disclose the data breach in a timely and accurate manner, Defendant violated Cal. Civ. Code § 1798.82.

267.    Pursuant to Cal. Civ. Code § 1798.84, "[a]ny waiver of a provision of this title is contrary to public policy and is void and unenforceable," "[a]ny customer injured by a violation of this title may institute a civil action to recover damages," and "[a]ny business that violates, proposed to violate, or has violated this title may be enjoined."

268.    As a direct and proximate result of Defendant's violations of Cal. Civ. Code § 1798.81.5 and § 1798.82, Plaintiffs and Subclass members were (and continue to be) injured and suffered (and will continue to suffer) damages, as described above.

269.    Plaintiffs and Subclass members suffered harm as a result of Defendant's failure to provide timely and adequate notice of the data breach:

a.    Had Defendant provided notice upon discovering the breach, in or around April 2021 or earlier, Plaintiffs would have had the information necessary to take steps to significantly mitigate or even prevent the privacy harm and other damages resulting from Defendant's conduct, including for example: negotiating a lower rate for Defendant's services in light of the lack of cybersecurity and privacy measures and the financial benefits Defendant received therefrom; switching insurance providers; seeking injunctive relief to prevent Defendant's disclosures of their Health Information; attempting to obtain Defendant's services without using its websites as frequently as, or in the manner that, they did; researching and potentially adopting measures, if any, to limit the information that their personal devices transmitted to Defendant and/or

third parties when Plaintiffs and Subclass Members interacted with Defendant's websites, or limiting how that information would be used; otherwise limiting Defendant's and third parties unjust gains derived from their Health Information; and contacting third parties receiving their Health Information and exercising deletion rights over the data prior to its use for any marketing, advertising, or unauthorized purpose; and

b.    Had Defendant provided notice at or around the time that it acted to sever the connection between Google Analytics and Google Ads, in or around January 2024 or earlier, or on or around February 11, 2025, when it claims to have discovered the breach, Plaintiffs would have had the information necessary to take at least some steps to mitigate the privacy harm and other damages resulting from Defendant's conduct, including for example: holding Defendant accountable for breaching the terms of its agreements with members; limiting how the information already disclosed would be used; investigating the scope of Defendant's use of Tracking Technologies as discussed herein and taking action to prevent those technologies from continuing to transmit their Health Information; otherwise limiting Defendant's and third parties unjust gains derived from their Health Information; and contacting third parties receiving their Health Information and exercising deletion rights over the data prior to its further use for any marketing, advertising, or unauthorized purpose.

270.    Plaintiffs and Subclass members seek relief under Cal. Civ. Code §1798.84, including, but not limited to, actual damages, any applicable statutory damages, and equitable and injunctive relief.

271.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT ELEVEN**
**California Unfair Competition Law ("UCL") Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(On behalf of California Subclass)**

272.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

273.    California Business and Professions Code, Section 17200, ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."

1    274.    Blue Shield engaged in unlawful and unfair business acts and practices in violation

2    of the UCL.

3    275.    Unlawful: Blue Shield has engaged in unlawful acts or practices in that the conduct

4    alleged herein constitutes violations of, among other things:

5    a.    the California Constitution's right to privacy;

6    b.    the ECPA;

7    c.    HIPAA, including specifically 42 U.S.C. § 1320d-6; and

8    d.    California health and computer privacy statutes including, but not limited to,

9    CMIA, CCPA, and Cal. Civ. Code § 1798.80.

10    276.    Unfair: Blue Shield engaged in unfair acts and practices in that it assures its

11    members that it will safeguard and not share Health Information without users' consent but in

12    reality knows (or should have known) that its websites where it directs its members had, and

13    continues to have, Tracking Technologies embedded in it resulting in the wrongful,

14    contemporaneous, redirection to unauthorized third parties of Plaintiffs' and Class members'

15    Health Information without their knowledge or consent.

16    277.    Blue Shield's conduct as alleged herein offends public policy, including California's

17    public policy of protecting consumer data.

18    278.    Blue Shield's conduct, misrepresentations and omissions have also impaired

19    competition within the health care market in that Blue Shield's conduct prevented Plaintiffs and

20    Class members from making fully informed decisions about whether to become a Blue Shield

21    member in the first instance since it requires one to use their websites in order to fully use the health

22    insurance that a member has paid for.

23    279.    Plaintiffs and Class members suffered an injury in fact, including the loss of money

24    and/or property, as a result of Blue Shield's unfair, unlawful and deceptive practices. First, Blue

25    Shield is not free and every single member of the Class pays Blue Shield premiums which if they

26    had known the true state of Blue Shield's websites they would have either not become a Blue Shield

27    Member in the first instance, not remained a Blue Shield member for as long as they did, or paid

28    less to do so. Blue Shield breached the terms of its express and/or implied contracts and deprived

Plaintiffs and Subclass members of the benefit of their bargain. Apart from paying Blue Shield premiums, Plaintiffs' and Class members' Health Information also has undeniable value as demonstrated by the fact that the third parties receiving the data are some of the biggest companies on earth (Google, Meta, etc.), that are able to use and monetize this information within their various advertising systems. While only an identifiable "trifle" of injury is needed to be shown, as set forth herein Plaintiffs, Class members, and the public at large value their Health Information at more than a "trifle" amount. And Blue Shield's disclosure of this confidential and valuable information has now diminished the value of such information to Plaintiffs and Class members.

280.    Blue Shield's actions caused damage to, and loss of, Plaintiffs' and Class members' property right to control the dissemination and use of their Health Information.

281.    Plaintiffs and Class members relied on Blue Shield's representation that it will not disclose Health Information without users' consent.

282.    Blue Shield's representation that it will not disclose Health Information without users' consent was untrue.

283.    Had Plaintiffs and Class members known the truth of Blue Shield's conduct, they would not have used the Blue Shield websites in the way that they did or not used it at all.

284.    The harms caused to Class members by Blue Shield as described herein, greatly outweigh any perceived utility (assuming there was any). Additionally, Blue Shield's acts have violated public policies as set out above. Finally, Plaintiffs and Class members suffered substantial injury due to their paying Blue Shield for health insurance and using what they thought were safe and secure Blue Shield websites (when they were not) resulting in the loss of their Health Information, and such loss could not have been avoided due to the surreptitious manner in which their Health Information was disclosed.

285.    The wrongful acts alleged herein occurred, and continue to occur. Blue Shield's misconduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

286.    Plaintiffs and Class members want to continue using Blue Shield's websites since it is the only reasonable way to get information relating to their health care, such as finding medical

providers, billing, explanations of benefits and related insurance coverage information, and to complete other tasks necessary to access health care services and maintain their health.

287.    If it does not change its practices, Blue Shield will continue to improperly and contemporaneously disclose Plaintiffs' and Class members' Health Information to unauthorized third parties. And, there is no reasonable way for Plaintiffs and Class members to know when such unauthorized disclosure is occurring or to stop it from occurring.

288.    As a result, the threat of future injuries identical to those that Blue Shield has already inflicted on Plaintiffs and Class members is actual, imminent and ongoing for Plaintiffs and Class members.

289.    Plaintiffs and Class members request that this Court enjoin Blue Shield from continuing its unfair, unlawful, and deceptive practices and to restore to Plaintiffs and Class members, in the form of restitution, any money Blue Shield acquired through its unfair, unlawful, and deceptive practices which would include, but not be limited to, premiums paid by Class members.

## COUNT TWELVE
### Declaratory Judgment Pursuant to 28 U.S.C. § 2201, *et seq.*
### (On behalf of Nationwide Class and California Subclass)

290.    Plaintiffs hereby incorporate the factual allegations set forth above by reference.

291.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.,* this Court is authorized to declare the rights and legal relations of the parties and to grant further necessary or proper relief. This includes the relief necessary to prevent and remedy Defendant's ongoing violations of federal and California privacy laws, as well as common law duties.

292.    An actual controversy exists between Plaintiffs and Defendant regarding Defendant's use of Tracking Technologies which have resulted in the unauthorized interception, disclosure, and misuse of Plaintiffs' and Class members' personal and private information, content of communications, and Health Information.

293.    Plaintiffs and Class members continue to suffer ongoing harm from Defendant's misconduct as alleged herein, as, despite Defendant's insufficient acknowledgment and notification of a breach, Defendant's tracking configuration continues to raise substantial privacy risks such

1    that it remains uncertain as to whether member Health Information is still being disclosed or

2    retained by third parties, and whether Defendant's security of such data remains compromised.

3    294.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter

4    a judgment declaring, among other things, the following:

5              a.    That Defendant owed and continues to owe a duty under Federal and

6    California law to prevent the interception, disclosure, and misuse Plaintiffs' and Class members'

7    Health Information;

8              b.    That Defendant's use of Tracking Technologies violated Plaintiffs' and

9    Class members' reasonable expectations of privacy and applicable legal obligations, including but

10   not limited to, the expectation that their Health Information would not be collected and shared with

11   unauthorized third parties; and

12             c.    That Plaintiffs and Class members are entitled to ongoing injunctive and

13   equitable relief to prevent further violations and protect their privacy rights.

14   295.    The Court should also issue corresponding injunctive relief, including, but not

15   limited to, enjoining Defendant from engaging in the unlawful use of Tracking Technologies now

16   and moving forward, to recover all of the Health Information improperly collected by third parties;

17   delete all Health Information wrongfully disclosed to any unauthorized third parties; to implement

18   safeguards and privacy-by-design practices sufficient to ensure future compliance with federal and

19   state laws; provide accurate and complete disclosures to members regarding data collection and

20   sharing practices; and other equitable relief.

21   296.    If an injunction is not issued, Plaintiffs and Class members will suffer irreparable

22   injury and lack adequate remedy in the event of Defendant's ongoing conduct.

23   297.    The requested declaratory and injunctive relief will serve the public interest by

24   compelling compliance with privacy laws, deterring future misconduct, and safeguarding the

25   sensitive information of potentially hundreds of thousands of Defendant's members.

26

27

28

CLASS ACTION COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Subclass set forth herein, respectfully request the following relief:

A.    That the Court certify this action as a class action and appoint Plaintiffs and their counsel to represent the Class;

B.    That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendant to adequately safeguard the Health Information of Plaintiffs and the Class by implementing improved security controls;

C.    That the Court award compensatory, consequential and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D.    That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E.    That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

F.    That the Court award to Plaintiffs and Class members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

G.    That the Court award pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. Rule Civ. P. 38, Plaintiffs hereby demand a jury trial.

CLASS ACTION COMPLAINT

1    Dated: May 5, 2025              **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

2

3                                    */s/ Michael W. Sobol*
                                     BY: Michael W. Sobol

4

5                                    Michael W. Sobol (State Bar No. 194857)
                                       *msobol@lchb.com*

6                                    Melissa Gardner (State Bar No. 289096)
                                       *mgardner@lchb.com*

7                                    275 Battery Street, 29th Floor
                                     San Francisco, CA 94111-3339

8                                    Tel: 415 956-1000
                                     Fax: 415-956-1008

9

10                                   Douglas Cuthbertson (*pro hac vice* forthcoming)
                                       *dcuthbertson@lchb.com*

11                                   Jahi Liburd (*pro hac vice* forthcoming)
                                       *jliburd@lchb.com*

12                                   250 Hudson Street, 8th Floor
                                     New York, NY 10013

13                                   Tel: 212 355-9500
                                     Fax: 212-355-9592

14

15   Dated: May 5, 2025              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

16

17                                   */s/ Joseph P. Guglielmo*
                                     BY: Joseph P. Guglielmo

18

19                                   Joseph P. Guglielmo (*pro hac vice* forthcoming)
                                       *jguglielmo@scott-scott.com*

20                                   230 Park Avenue, 24th Floor
                                     New York, NY 10169

21                                   Telephone: (212) 223-6444
                                     Facsimile: (212) 223-6334

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

1     Dated:  May 5, 2025      **KIESEL LAW LLP**

2

3                         */s/ Jeffrey A. Koncius*
                        BY: Jeffrey A. Koncius

4

5                         Jeffrey A. Koncius, State Bar No. 189803
                          *koncius@kiesel.law*

6                         Nicole Ramirez Jones, State Bar No. 279017
                          *ramirezjones@kiesel.law*

7                         8648 Wilshire Boulevard
                        Beverly Hills, CA 90211-2910

8                         Tel: 310-854-4444
                        Fax: 310-854-0812

9

10    Dated:  May 5, 2025      **SIMMONS HANLY CONROY LLP**

11

12                        */s/ Jason "Jay" Barnes*
                       BY: Jason "Jay" Barnes

13                        Jason 'Jay' Barnes (*pro hac vice* forthcoming)
                       *jaybarnes@simmonsfirm.com*

14                        An Truong (*pro hac vice* forthcoming)
                       *atruong@simmonsfirm.com*

15                        Eric Johnson (*pro hac vice* forthcoming)
                       *ejohnson@simmonsfirm.com*

16                        Jenny Paulson (*pro hac vice* forthcoming)
                       *jpaulson@simmonsfirm.com*

17                        112 Madison Avenue, 7th Floor
                       New York, NY 10016

18                        Tel.: 212-784-6400
                       Fax: 212-213-5949

19

20                        *Attorneys for Plaintiffs and the Proposed Class and Subclass*

21

22

23

24

25

26

27

28

         CLASS ACTION COMPLAINT

## **ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: May 5, 2025                              /s/     *Michael W. Sobol*
                                                        Michael W. Sobol

CLASS ACTION COMPLAINT